843 A.2d 153

**Arthur J. HOFFMAN, et al.**

v.

**Toyome STAMPER, et al.**

**No. 560, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Feb. 27, 2004.

262

James E. Carbine, Baltimore, Daniel J. Tobin (Kirkpatrick & Lockhart, LLP, on the brief), Washington, for appellant.

Andre R. Weitzman, Baltimore (Cheryl L. Hystad, on the brief), Baltimore, for appellee.

Panel: KENNEY, DEBORAH S. EYLER and CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

In a civil case in the Circuit Court for Baltimore City, a jury found Robert Beeman ("Beeman"), Suzanne Beeman, and their company, A Home of Your Own, Inc. ("AHOYO"), liable for conspiracy to defraud, fraud, and violations of the Maryland Consumer Protection Act ("MCPA"), for perpetrating a scheme to sell the appellees, plaintiffs below, dilapidated residential properties at grossly inflated prices. Through Beeman, AHOYO purchased the properties for small sums and quickly sold them to the appellees (whom for ease of discussion we shall from time to time call "buyers") at huge profits.[1] Although by agreement of counsel the word "flipping" was not used at trial, that is the colloquialism for the type of fraudulent scheme practiced by the Beemans and their company.

---

[1]. The appellees are, in the order stated in the amended complaint: Toyome Stamper; Inez Coward; Carl Haley; Gertrude Green; Eva Elder; Denise Brower; Forrest Spencer; Francine Henderson; and Jerry McFadden.

The Beemans and AHOYO are not parties to this appeal, and their fraud and consequent liability in tort to the buyers are not in question.[2] The appellants are three co-defendants who were tried jointly with the Beemans and AHOYO: Irwin Mortgage Corporation ("Irwin"), the lender that extended FHA financing to each buyer; Joyce Wood ("Wood"), a loan officer employed by Irwin who handled the financing for each transaction; and Arthur J. Hoffman ("Hoffman"), the appraiser who performed the property valuation in each transaction. The buyers' theory of liability against Irwin was based solely on vicarious liability for the wrongful acts of Wood.

At trial, the appellants claimed to have known nothing about Beeman's scheme and to have been his unwitting victims. The buyers asserted, on the contrary, that Wood and Hoffman (and Irwin, through Wood) not only knew about but also participated in Beeman's design to sell them dilapidated houses at vastly inflated prices. The jury agreed with the buyers and found Irwin, Wood, and Hoffman liable for conspiracy to defraud and fraud, and for violations of the MCPA.

The buyers were awarded a total of $129,020.03, in economic damages, and $1,305,000, in non-economic damages, against all the defendants.[3] Because the court granted a motion for judgment that kept the issue of punitive damages against Irwin, Wood, and Hoffman from the jury's consideration, that issue went to the jury against the Beemans and AHOYO only. The jurors decided that punitive damages were warranted. Thereafter, in a separate proceeding, they awarded the buyers $1,800,000 in punitive damages against the Beemans and AHOYO.

After denying post-trial motions for judgment notwithstanding the verdict ("JNOV") and new trial or remittitur, the trial

---

2. Beeman and AHOYO did not file a notice of appeal. Suzanne Beeman filed a notice of appeal, but after failing to file a brief in this Court, voluntarily dismissed her appeal.

3. As we shall explain, the economic damages awards varied from buyer to buyer; by contrast, each buyer was awarded $145,000 in non-economic damages.

court granted the buyers' petition for attorneys' fees under the MCPA, awarding them fees of $195,591.26, against all the defendants. The court ruled that the fee award would be reduced by the amount of fees recovered on the judgment for fraud, however.

The appellants have raised a multiplicity of questions for review on appeal. We have combined and rephrased the questions, as follows:

I. Did the circuit court err in denying Hoffman's motion for removal?

II. Did the trial court err in denying the defense motions for judgment and JNOV on the conspiracy to defraud, fraud, and MCPA claims; and Irwin and Wood's motion for JNOV on the affirmative defense of fraud?

III. Did the trial court err in denying the defense motions for judgment, JNOV, and new trial/remittitur on the issue of non-economic damages?

IV. Did the trial court err in declining to instruct the jury on the defense of equitable estoppel; in giving an erroneous instruction on economic damages; and in declining to give a curative instruction during closing argument? [4]

---

4. The questions as posed by Hoffman are:

1. Did the trial court err when it denied Appellant Hoffman's Motion for Removal prior to trial based upon Appellant Hoffman's affidavit stating that he could not receive a fair and impartial trial in Baltimore City, where there was a reasonable ground to believe that the allegation was correct?

2. Did the trial court err when it denied Appellant Hoffman's motion for judgment and motion for judgment notwithstanding the verdict as to Count I of the Amended Complaint, because there was no clear and convincing evidence from which a reasonable jury could have concluded that Appellant Hoffman was a party to an agreement to conspire?

3. Did the trial court err when it denied Appellant Hoffman's motion for judgment and motion for judgment notwithstanding the verdict as to Count II of the Amended Complaint, because there was no clear and convincing evidence from which a reasonable jury could have concluded that any of the Plaintiffs/Appellees relied on Appellant Hoffman's appraisals or the information contained therein and be-

Note 4—Continued

cause Plaintiffs/Appellees, as a result, could not prove all of the essential elements of fraud?

4. Did the trial court err when it denied Appellant Hoffman's motion for judgment and motion for judgment notwithstanding the verdict as to Count III of the Amended Complaint, because there was no evidence from which a reasonable jury could have concluded that the Appellant dealt directly with the Plaintiffs/Appellees, as consumers, and because, as a result, the provisions of the Maryland Consumer Protection Act do not apply to Appellant's conduct?

5. Did the trial court err when it denied Appellant Hoffman's motion for judgment, motion for new trial or in the alternative for remittitur, and motion for judgment notwithstanding the verdict as to the non-economic damages claim of Plaintiffs/Appellees, because there was no evidence from which a reasonable jury could have concluded that any of the Plaintiffs/Appellees suffered emotional injury which was capable of objective determination and because their claim of loss of credit standing was speculative, contrary to the evidence produced by plaintiffs at trial and unavailable as non-economic damages as a matter of law?

The questions as posed by Irwin and Wood are:

1. Did the trial court err when it declined to instruct the jury on equitable estoppel and when it denied Appellants' motions for judgment and for JNOV, where Plaintiffs admitted knowingly and willfully submitting false gift letters on which their mortgages were based?

2. Did the trial court err when it permitted the jury to hold Appellants liable for conspiracy on the basis of "willful blindness" to Beeman's wrongdoing rather than on the basis of an intentional agreement by Appellants to conspire?

3. Did the trial court err when it permitted the jury to hold Appellants liable for fraud on the basis of Beeman's wrongdoing rather on the basis of fraudulent misrepresentations by Appellants?

4. Did the trial court err when it denied Appellants' motions for judgment and for JNOV as to Plaintiffs' conspiracy claim, where there was no evidence from which a reasonable jury could have concluded that Appellants entered into a conspiratorial agreement?

5. Did the trial court err when it denied Appellants' motions for judgment and for JNOV as to Plaintiff's fraud claim, where there was no evidence from which a reasonable jury could have concluded that Plaintiffs satisfied any of the elements of common law fraud against Appellants?

6. Did the trial court err when it denied Appellants' motions for judgment and for JNOV as to Plaintiffs' claim under the MCPA, where there was no evidence from which a reasonable jury could have concluded that Plaintiffs satisfied any of the elements of a claim for damages under the MCPA?

7. Did the trial court err when it instructed the jury and when it denied Appellants' motions for judgments and for JNOV as to Plaintiffs' claim for non-economic damages, where there was no evidence from which a reasonable jury could have concluded that Plaintiffs were entitled to recover non-economic damages under the standards required by Maryland law?

The appellees noted a cross-appeal, raising two questions, which we have reworded as follows:

 V. Did the trial court err in granting motions for judgment in favor of Irwin, Wood, and Hoffman on punitive damages?

 VI. Did the trial court err in ruling that the amount received by the buyers' counsel for the common law claims pursuant to the contingency fee agreement would be deducted from its award of attorneys' fees under the MCPA?

For the following reasons, we shall affirm the judgment of the circuit court for compensatory damages; reverse the judgment of the circuit court on the issue of punitive damages against Irwin, Wood, and Hoffman; vacate the attorneys' fees award against Irwin, Wood, and Hoffman; and remand the case for further proceedings not inconsistent with this opinion on the issue of punitive damages and on the petition for attorneys' fees.

## FACTS AND PROCEEDINGS

Beginning in 1996, Beeman and his wife, Suzanne, through their company, AHOYO, embarked on a connivance to profit by buying up dilapidated residential properties in or near Baltimore City at low prices and quickly selling them to the unwary at hugely inflated prices. The Beemans and AHOYO targeted low income, unsophisticated renters in poor neighborhoods who dreamed of someday owning their own homes, and enticed them with promises that they could be homeowners for "only $500 down."

---

Note 4—Continued

 8. Did the trial court err when it declined to give a curative jury instruction to address Plaintiffs' counsel's closing argument, in which the jury was asked to take into account improper considerations in assessing non-economic damages?

 9. Did the trial court err [in] instruct[ing] the jury on economic damages, where the trial court declined to instruct the jury on the proper measure of economic damages and misstated the Plaintiffs' burden of proof?

The scheme involved tricking a prospective buyer into thinking he or she was purchasing a "rehabbed" house, or one that would be fully renovated by the time of settlement, and having Beeman illegally pay settlement and other costs, including paying off the buyer's creditors, so the transaction could go to closing—at which time Beeman's profits would far exceed the money he had fronted to make the deal happen. The properties Beeman's company purchased were in slum conditions. He would make cosmetic changes to a property and pass it off as "rehabbed." After settlement, the buyer was left with a property that was either uninhabitable or in seriously decayed condition, and was worth far less than the mortgage loan taken to buy it. Beeman continued this practice until early 1998, when he became the subject of a federal criminal investigation.[5]

This case involves eight of Beeman's and AHOYO's real estate transactions. Seven went to closing between July and December 1997, and one closed in January 1998. There were two buyers in one transaction; hence, there were nine buyer/plaintiffs at trial. The basic facts of the eight transactions, showing the purchases by Beeman/AHOYO and sales to the buyers, are as follows (chronologically by settlement date):

1. **17 North Kresson Street/Buyer Jerry McFadden**
 April 23, 1997: Purchased for $14,500
 July 11, 1997: Sold for $52,000

2. **612 E. 41st Street/Buyer Carl Haley**
 June 25, 1997: Purchased for $20,000
 August 22, 1997: Sold for $57,200

3. **610 North Belnord Road/Buyer Gertrude Green**
 June 18, 1997: Purchased for $12,500
 September 8, 1997: Sold for $44,000

4. **5601 Force Road/Buyers Denise Brower and Forrest Spencer**
 August 7, 1997: Purchased for $24,000
 September 24, 1997: Sold for $65,900

---

**5.** On December 11, 2000, Beeman pleaded guilty in the United States District Court for the District of Maryland to charges of mail fraud and aiding and abetting mail fraud. He was given a three-year sentence to be served at a minimum security camp, in Lewisburg, Pennsylvania.

5. **406 Oldham Street/Buyer Francine Henderson**
 March 27, 1997: Purchased for $17,550
 October 9, 1997: Sold for $65,000

6. **3132 Piedmont Road/Buyer Eva Elder**
 September 5, 1997: Purchased for $29,551
 October 22, 1997 Sold for $51,000

7. **6521 Lenhart Street/Buyer Toyome Stamper**
 September 5, 1997: Purchased for $41,790
 December 5, 1997: Sold for $87,250

8. **1127 Carroll Street/Buyer Inez Coward**
 September 29, 1997: Purchased for $7,550
 January 28, 1998: Sold for $58,000

The eight transactions were similar in most material respects and followed the same factual pattern.

Through AHOYO, Beeman would buy up depressed residential properties and then advertise in newspapers in Baltimore City that he could help people with little income and with credit problems buy houses with down payments of no more than $500. Some of the buyers in this case read Beeman's advertisements. Most of them heard about Beeman and AHOYO through word of mouth from others who had read the advertisements or had dealt with Beeman directly. Each of the buyers wanted to own a house and called Beeman for help.

The buyers had similar backgrounds. Each lived in a rental unit in Baltimore City and had been employed for at least two years in a steady job that paid a modest wage. None had ever owned real property and none had any experience buying or selling real property. Most of the buyers had graduated from high school or held GEDs, but some had dropped out of high school. A few had taken some college courses. Each had experienced credit problems and for that reason had a marginal credit history. All were unsophisticated in business matters. Many were renting units in crime-ridden neighborhoods and wanted to move so their families would have a safe place to live.

After the buyer called Beeman and left a message on his pager, Beeman would return the call and agree to a meeting. Usually Beeman went to the buyer's home. At the meeting, Beeman obtained preliminary income information and ran a

credit report. After determining that the buyer's credit problems were not so insurmountable as to preclude obtaining financing, Beeman would offer to assist the buyer in purchasing a house in a neighborhood the buyer liked in or near Baltimore City.

Beeman's sales pitch was "the American Dream." He told his prospective buyers that nothing made him happier than to see a poor person with bad credit problems become a homeowner, and promised to "walk the buyer through" the process of purchasing a house. The buyers all believed that Beeman was representing them in the home-buying process. Beeman seemed likeable, and all the buyers were impressed by him. As one buyer testified, Beeman was "smooth." They thought he was a nice man and a professional, and trusted him to look out for their interests.

Either on the same day as his first meeting with the buyer or soon thereafter, Beeman would drive the buyer to see various properties, like a real estate agent would do. Some of the buyers seemed to understand that AHOYO owned the properties that Beeman was showing; some did not know who owned the properties. Most of the buyers did not seem to know that Beeman himself was the seller, *i.e.*, owned the selling company; some did know that Beeman, or at least his company, was the seller. Two of the buyers thought that Beeman was the lender in the transaction. Many had no understanding at all of Beeman's role. All of the buyers thought that Beeman was working for them.

When the buyer he was meeting with expressed an interest in a particular property, Beeman would offer to help obtain purchase mortgage financing, through Irwin.[6] Then, either that day or soon thereafter, Beeman would drive the buyer to Irwin's office in Columbia, Maryland. There, Beeman and the buyer would meet with Joyce Wood. Wood worked on commis-

---

6. At the times relevant to the case, Irwin was known as Inland Mortgage Corporation. For ease of discussion, we shall use "Irwin" to refer to Inland Mortgage Corporation and Irwin Mortgage Corporation.

sion and so was compensated only for work performed on loans that in fact were extended.

Beeman and Wood knew each other before any of the transactions in this case took place. In early 1997, Beeman contacted Wood, saying that he was a real estate investor involved in buying, renovating, and selling properties in Baltimore City, and that he was looking for financing sources for his buyers. Wood agreed to meet Beeman at Pargos Restaurant.

At their meeting, Wood educated Beeman about the different types of loans available to first time homebuyers with little in the way of income or assets. In particular, Wood introduced Beeman to Federal Housing Administration ("FHA") backed lending, about which he knew nothing.[7] The FHA is an agency within the Department of Housing and Urban Development ("HUD"), and the loans it backs are governed by strict HUD regulations designed to promote home-ownership and prevent fraud.

As a loan officer, Wood was familiar with the HUD regulations governing FHA loans. She told Beeman that a qualified buyer could obtain an FHA loan for 100% of the purchase price of the property and that the seller could contribute up to 6% to the purchase price. In addition, Wood explained that the buyer could use gift money from a relative to pay for closing costs. Wood also told Beeman that such a gift would have to be verified by the lender, *i.e.*, Irwin, by means of a gift letter signed by the donor and the buyer and evidence that the gift money had been drawn from the donor's account. Wood further explained that, for an FHA loan to be approved, any judgments and collections against the buyer had to be cleared by payment. Finally, Wood told Beeman that, for any given transaction, she could use Irwin's computer software to generate a "Good Faith Estimate" of the maximum loan amount

---

**7.** Although Beeman's practice of "flipping" properties began in 1996, until he connected with Wood, he had used sub-prime lenders to arrange financing for buyers.

available, based on the buyer's income, and to calculate the closing costs.

Wood knew that, among other things, HUD regulations prohibit a seller or other interested party to a transaction from playing any role in the buyer's obtaining a gift and gift letter for the closing costs, verifying a gift letter, furnishing funds for closing, and clearing credit problems for the buyer. She also knew that, if and when an FHA loan goes into default, and the lender ultimately forecloses, federal law requires the lender to convey the property to the FHA, and the FHA then reimburses the lender for most of its losses. The FHA thus provides insurance to lenders, and so promotes home-ownership for the poor.

Wood and Beeman stayed in contact after their initial meeting. Wood furnished Beeman with copies of the blank gift letter form that Irwin was using for FHA loans.

In the case of each buyer, at the meeting at Wood's office, the buyer gave Wood information about his or her income, assets, and credit, and signed a preliminary application for an FHA mortgage, which was filled in by Wood. Also in each case, the preliminary application stated that closing costs for settlement were to be financed by a "gift." Precisely what was said and done at the initial meetings between the buyers, Wood, and Beeman was critical to Irwin and Wood's liability *vel non* and was hotly contested at trial. Because several of the questions presented on appeal concern the sufficiency of the evidence on the buyers' claims, and we review those issues by considering the evidence in the light most favorable to the buyers, *see John Crane, Inc. v. Scribner*, 369 Md. 369, 378, 800 A.2d 727 (2002), we shall set forth in some detail, and in chronological order by settlement date, each buyer's testimony about what happened at the initial meeting with Wood, together with other surrounding facts for context.

1) *Jerry McFadden:* Beeman came to McFadden's house, asked about his credit, ran a credit report on him, and had him sign several documents. He came back the next day and drove McFadden to see four properties. McFadden liked the

one on North Kresson Street. Beeman told him the house would probably cost about $50,000, but he was not sure. Beeman also told him not to worry about financing, that he would take care of it.

A few days later, Beeman drove McFadden to Wood's office. McFadden thought Wood worked for Beeman, as his secretary or assistant. At the meeting, Wood showed McFadden a contract of sale, with his signature, that gave the contract price as $52,000. Wood told him that was the purchase price for the house. McFadden did not know that Beeman owned the property. When the subject of closing costs came up, Wood told Beeman that McFadden would need a gift letter to get the house. Before the meeting, Beeman had mentioned something about a gift letter. At the end of the meeting, McFadden was asked to sit outside while Wood and Beeman talked.

2) *Carl Haley*:[8] Beeman drove Haley by the house on 41st Street and later took him inside. Haley did not know that Beeman owned the house. Beeman took him to the initial meeting with Wood. Haley thought that "they" were lending him money to buy the house. At the meeting, Wood and Beeman told him that the price for the house was $57,000. Before then, based on his conversations with Beeman, he thought the price was $35,000 or $40,000. Wood asked Haley about his employment, income, and credit. Before the meeting, Beeman had asked Haley if he had a relative with a bank account. Haley said yes, that his niece did. At the meeting, the subject of a gift letter came up, and Beeman told Wood that Haley's niece was going to give him money.

3) *Gertrude Green:* Beeman drove Green to the house on North Belnord Street, and she said she liked it. They got back in Beeman's vehicle and discussed how much she could afford to pay monthly for a mortgage. Green gave Beeman a figure that coincided with her weekly paycheck. Beeman called Wood from his cell phone. Up until then, Green and

---

8. Haley died before trial, so his testimony was by deposition.

Beeman had not discussed the sales price for the house. After the phone call, Beeman said the price was $38,000. Green did not negotiate with Beeman about the price. She did not know that she needed a loan to buy a house; she thought she could pay for the house monthly, like paying rent.

A few days later, Beeman presented Green with some papers, which she signed. Thereafter, Beeman took Green to Wood's office. Wood asked Green questions about her income and bank statements. Wood then presented Green with a Good Faith Estimate document that showed the sales price of the house to be $44,000. That is when Green learned the actual sales price for the house.

During the meeting with Wood, the subject of a down payment or money for closing costs came up, and Wood asked about a gift letter. Beeman interrupted, telling Wood, "all of that was taken care of." Green did not say anything at all about a gift or a gift letter. Nevertheless, the preliminary loan application filled out that day, in Wood's handwriting, states, "Gift from son to pay for closing and BGE collections." Green never told Wood that. Green thought that Beeman was the person lending her the money to buy the house. For part of the meeting, Green was asked to leave, and Beeman and Wood met privately.

4) *Denise Brower and Forrest Spencer:* Beeman took Brower and Spencer to see three properties, including 5601 Force Road. Before then, Beeman told them that his company, AHOYO, provided people with homes and that he would "walk [them] through every facet of buying a house and that he would take care of just about everything." Brower signed a contract of sale the day that Beeman showed them the Force Road property. Spencer, who has a learning disability and an 8th grade education, did not remember any discussion of price then. Spencer remembers that later, Beeman said that the house would cost $65,900, and that that was a good price because others in the neighborhood were selling for $75,000 to $80,000. Brower does not remember agreeing to pay $65,900 for the house, but that is what the contract of sale reflects.

Spencer did not know that Beeman or his company owned the house on Force Road, and was not sure what Beeman's exact role was.

Beeman told Brower and Spencer that he knew a loan officer who could help them get money to buy the house. He then drove them to Wood's office. During the meeting, Wood and Beeman left the room several times; at one point, Beeman had Brower and Spencer leave the room. Later, when they all were present in the room, Wood asked Brower and Spencer how they intended to pay for closing costs. They were "a little dumbfounded" and turned to Beeman. Wood and Beeman then said in unison, "a gift letter." When Wood brought up the subject of a gift letter at the meeting, Brower thought that a gift letter was a "standard practice" when buying a house. Wood presented Brower and Spencer with a Good Faith Estimate document that showed what their monthly mortgage payment would be.

5) *Francine Henderson:* Beeman took Henderson to see the house on Oldham Street, which she told him she liked. He told her the price for the house was $58,000. Beeman then drove Henderson to Wood's office. Wood asked about her debts, credit, and income. Henderson signed a preliminary loan application, but did not fill it out. Before the meeting, Beeman asked Henderson whether there was someone in her family "that had a bank account to give [her] a gift letter." That was the first time she heard anything about a gift letter.

During the meeting, Wood asked Beeman whether he had the gift letter. Beeman responded that "he would take care of it." Wood showed Henderson the Good Faith Estimate document reflecting what her monthly mortgage payments would be. Wood did some calculations and said the sales price for the house was "sixty-two thousand." Wood then looked at Beeman, and he said, "no, sixty-five." This is when Henderson learned the actual sales price for the house. She did not question Wood or Beeman about it.

6) *Eva Elder:* On three occasions, Beeman came to Elder's house and took her to see several properties. She saw a

house that she liked on the last trip, on Piedmont Street. She asked Beeman the sales price, and he said he did not know, that he would have to look in a book he had in his car to find out. He drove her back to her house without telling her the sales price. Later, when he drove Elder to Wood's office, he showed her a contract of sale that listed the purchase price of the property as $51,000. At the meeting, Wood did not talk to Elder about money for closing costs. Wood directed herself to Beeman and said, "this too would be a gift." Elder did not know what that meant.

7) *Toyome Stamper:* Beeman took Stamper to see the house on Lenhart Street. She told him she wanted to buy it and then signed a contract of sale he furnished. The sales price on the contract was left blank. Stamper told Beeman she would need a loan to buy the house. When Beeman said he had a loan officer he dealt with, Stamper left it to him to arrange the loan. Stamper did not know that Beeman (or AHOYO) was the owner of the Lenhart Street house.

That same day, Beeman drove Stamper to Wood's office. Stamper waited in the reception area while Beeman and Wood met. She was then signaled to come into the conference room. Wood introduced herself and asked Stamper questions about her income. Beeman asked questions about her credit. When Wood presented Stamper with the Good Faith Estimate document, Stamper learned that the sale price for the house was $86,500. Until then, she did not know what the sale price was. Her primary concern was that the monthly mortgage payment would be affordable, and the Good Faith Estimate showed what that payment would be. There was no discussion whatsoever at that meeting about a gift or about closing costs. Yet, Stamper's loan application, filled out by Wood, reflected that closing costs would be paid by a gift.

8) *Inez Coward:* Beeman showed Coward the house on Carroll Street and told her he would sell it to her for $40,000. He presented her with a sales contract and she signed it, but no price was written on it. Beeman then said he would take Coward to a "finance company." He drove her to Wood's

office. Wood asked her questions about her income and credit. Coward signed a preliminary loan application, but did not fill it in. Wood asked whether Coward had a bank account; she said yes. Wood then asked whether she had any money. When she said no, Wood said, "there we go a gift again."

On three occasions during the meeting, Wood and Beeman left the room and then returned with documents. They were discussing Coward's monthly mortgage payment. Wood said the monthly payment was lower than it might have been, left the room, and then came back and asked Coward whether she thought she could pay more. Each time this happened, "the price went up." The monthly mortgage payment went from $426 to about $450.

Wood presented Coward with a Good Faith Estimate document and gave her a copy of it. She took it with her. Later, she read it and noticed that the price for the house was $58,000, which was a "jump" from the $40,000 Beeman had said it was. Coward called Beeman about the "jump." He told her the price for the house had gone up because she had no money and so she had to pay extra "fees."

In every case, sometime after the meeting with Wood, Beeman asked the buyer to designate a person who had a bank account who could be the "donor" of a gift that would be used for closing costs. Once the buyer had designated a "donor," Beeman filled out one of the form "gift letters" furnished by Wood, giving the names of the buyer and the "donor," their relationship, and the amount of the gift. Beeman then presented the "gift letter" to the buyer and the "donor" to sign. Once that was done, Beeman arranged to meet the "donor," sometimes alone and sometimes with the buyer present, at the "donor's" bank or credit union. Beeman arrived with cash, often stuffed in suitcases, in an amount equal to the "gift." He gave the cash to the "donor" to deposit in the "donor's" account. With Beeman standing watch, the "donor" then obtained a certified check for that amount, payable to the buyer, and handed it over to Beeman.

If a buyer questioned Beeman about the gift transaction, Beeman explained that this method of operation was necessary to provide the closing costs for the sale and that it was the usual way things were done. The buyers all understood that their "donors" were not really making gifts; rather, the money was coming from Beeman. From what Beeman told them, however, the buyers thought the "gift letter" process was a standard part of the process for buying a house. Some of the buyers testified that Wood's raising the "gift" transaction in the initial meeting led them to think it was a legitimate practice, if Beeman had not already raised it with them, or confirmed their thinking that it was a legitimate practice, if Beeman already had brought it up. All of the buyers testified that they did not know that the "gift" process used in their transaction was illegal and, had they known, they would not have participated in it.

In several cases, Beeman assisted buyers in correcting their credit problems so they could be approved for the FHA loans. Wood forwarded confidential credit reports of the buyers to Beeman so he could clear up credit problems that would have prevented approval of their loans. Wood did that even though Beeman, under FHA regulations, should not have been provided the reports.[9]

To obtain an FHA loan to purchase property, the next step was to have the property appraised pursuant to FHA guidelines, which require that an FHA-approved appraiser inspect it, and that the appraised value reflect at least the purchase price on which the loan is being extended. For each of the eight transactions in this case, Irwin and Wood selected Hoffman to perform the property appraisal. For many years, Hoffman had been employed by Irwin as an appraiser. Not long before the transactions at issue, his status was changed

---

9. In her deposition, Wood acknowledged funneling credit information about the buyers to Beeman. When she testified to the contrary at trial, her deposition testimony was used to impeach her and was introduced into evidence, substantively.

from employee to independent contractor. He still received 99% of his income from Irwin, however.

In the transactions in this case, Hoffman was paid $300 per appraisal. In each appraisal except one, he valued the property for precisely the price on the sales contract. In the one exception, he valued the property $500 above the contract price. We shall discuss particular facts pertinent to the appraisals and to Hoffman in our discussion of the issues. In 1998, Hoffman destroyed all the files for the eight transactions in this case.

In each case, the buyer testified that the property was in poor condition when Beeman showed it to him or her, but that Beeman promised that his workers would make repairs and that the property would be in good condition by settlement time. Thus, the buyers expected that their properties would be attractive and habitable. In most cases, the buyer brought up the topic of an inspection. Beeman responded either by saying that, because the buyer had no money, Beeman would pay for an inspection, or by saying that an inspection was not necessary because the FHA was going to have the house inspected before it extended the loan. Also in most of the cases, on the day of settlement, there was a brief "walk through" that the buyer attended with Beeman. Usually, there were workers present in the house, making repairs of a cosmetic nature.

Beeman drove each buyer to the closing, which was held at a lawyer's office. No one from Irwin attended the settlement. Beeman brought with him the cashier's check representing the buyer's "gift money," which was used to pay the closing costs necessary to effectuate the transaction. As the sellers, the Beemans and AHOYO received a check for the amount of the profit on the sale.

All of the buyers testified that soon after moving into their properties, they experienced serious problems. The problems ranged from complete lack of heat, to ceilings caving in, to faulty plumbing, to non-functional appliances, to rodent and insect infestation. When they attempted to contact Beeman,

he either did not respond, or sent workers to make slight repairs, and then would not respond.

One buyer never moved into her property because it was uninhabitable; the property ultimately was foreclosed on. Five other buyers moved into their properties but then lost them to foreclosure. Three of the buyers kept their properties despite their poor conditions, and still were occupying them at the time of trial.

We will recite additional facts as necessary to our discussion of the issues.

## DISCUSSION

### Appeal Issues

### I.

#### DENIAL OF MOTION FOR REMOVAL

The buyers filed suit against all of the defendants in August 1998. Their amended complaint, the operative pleading in the case, was filed on March 22, 1999.

On August 13, 2001, four months after his motion for summary judgment on liability was denied and two days before a scheduled pre-trial conference, at which a trial date was to be selected, Hoffman filed a Rule 2–505(a) motion to remove the case on the ground that he could not receive a fair trial in Baltimore City or any contiguous county.

In a supporting affidavit, Hoffman alleged that, beginning on February 4, 1998, and until shortly before the motion was filed, the *Baltimore Sun* published no fewer than 39 articles or editorials on the practice of property "flipping" in Baltimore City. According to Hoffman, most of the articles commented on the role of appraisers in the practice of "flipping," portraying them as dishonest and their appraisals as overblown and misleading, while depicting the purchasers and lenders involved in the transactions as innocent victims. Hoffman attached to his affidavit 25 of the *Baltimore Sun* articles or editorials that he claimed were prejudicial to him. The two

earliest were published on February 4 and 12, 1998; thirteen were published between August 1, 1999, and December 16, 1999; five were published in 2000; and four were published in 2001, with the most recent article dated July 28, 2001. Hoffman listed the other 16 articles, all of which were published in 2000 and 2001, by title and date.

Hoffman also attached a videotape of a two-night investigative feature story about "flipping" that aired on Channel 13. It included a segment in which the lawyer for the buyers in this case characterized the real estate appraisals performed in "flipping" situations as "outright fraud[s]." Hoffman further attested that, in 1999, "flipping" was the subject of coverage on a local radio show and another local television news report.

Based on all of this, Hoffman complained that the extensive media coverage made it impossible for him to receive a fair trial:

Real estate appraisers in flipping cases have already been tried and convicted in the press. One *Baltimore Sun* editorial calls for the criminal prosecution of these appraisers. One appraiser has been convicted and is now in prison.... The media coverage I have described is wide spread and has saturated the entire Baltimore metropolitan area. The entire potential pool of jurors has been exposed to this highly prejudicial and judgmental coverage. As a result, I cannot receive a fair and impartial trial in Baltimore City, nor in the counties contiguous to Baltimore City.

Hoffman did not request a hearing on his motion. Two days after the motion was filed, and before any response was submitted, the circuit court denied the motion in a one paragraph order stating that the court found no reasonable ground to believe Hoffman's allegation that he could not receive a fair and impartial trial in Baltimore City.

On appeal, Hoffman contends the court erred in denying his motion for removal. He argues that the newspaper articles and editorials about "flipping" and the television coverage of the subject, particularly the two-night investigative report on Channel 13, established reasonable ground to believe his alle-

gation that he could not receive a fair and impartial trial in Baltimore City or the contiguous counties; and that the court erred in finding otherwise. He further argues that under Rule 2–505, because his motion was accompanied by an affidavit alleging that he could not receive a fair and impartial trial in the county in which the action was pending, and because the court properly should have found reasonable ground to believe the allegation, removal was required.[10] Finally, Hoffman argues that the jury's award of punitive damages against the Beemans and AHOYO in twice the amount the buyers' lawyer requested in closing argument, in addition to what Hoffman characterizes as an excessive award for non-economic damages against all the defendants, reveals an outraged jury that must have been infected by bias before the trial even started.

The right of removal is guaranteed to the citizens of Maryland by Article IV of the state constitution. The pertinent provision states:

> In all ... cases of presentment or indictment [other than capital cases],[11] and in all suits or actions at law ... pending in any of the courts of law in this State which have jurisdiction over the cause or case, in addition to the suggestion in writing of either of the parties to the cause or case that the party cannot have a fair and impartial trial in the court in which the cause or case may be pending, it shall be necessary for the party making the suggestion to make it satisfactorily appear to the court that the suggestion is true, or that there is reasonable ground for the same; and thereupon the court shall order and direct the record of the proceedings in the cause or case to be transmitted to some

---

**10.** Hoffman, in his brief, states that "the trial court in this case did not make the necessary finding that there was not a 'reasonable ground to believe' [his] allegation of prejudice was correct." This statement ignores the language of the court's order denying his motion, which states that the court "found that there is no reasonable ground to believe that the allegation is correct."

**11.** The right of removal in capital cases is guaranteed by subsection 8(b) of Article IV of the Maryland Constitution.

other court, having jurisdiction in the cause or case, for trial. . . .

Md. Const. art. IV, § 8(c).

 The purpose and intent of the removal provisions of the Maryland Constitution, including the provision quoted above, is " 'to get rid of the influence of local prejudice in the community from which the jury to try the case w[ill] come, and thus, as far as practicable, to secure a fair and impartial trial by jury.' " *Redman v. State*, 363 Md. 298, 323, 768 A.2d 656 (2001), *cert. denied*, 534 U.S. 860, 122 S.Ct. 140, 151 L.Ed.2d 92 (2001), *reh'g denied*, 535 U.S. 966, 122 S.Ct. 1387, 152 L.Ed.2d 376 (2002) (quoting *Greenberg v. Dunn*, 245 Md. 651, 654–55, 227 A.2d 242 (1967)). Because the right of removal is fundamental, the constitutional provision and implementing rules, criminal and civil, must be liberally construed in favor of the right. *Greenberg, supra*, 245 Md. at 657, 227 A.2d 242.

 Rule 2–505 implements the right of removal in civil actions at law.[12] It states, in relevant part:

(a) Grounds. (1) Prejudice. In any action that is subject to removal ... any party may file a motion for removal accompanied by an affidavit alleging that the party cannot receive a fair and impartial trial in the county in which the action is pending. If the court finds that there is a reasonable ground to believe that the allegation is correct, it shall order that the action be removed for trial to a court of another county.

 "The right of removal ... entitles a party to have a case removed to a court in another jurisdiction if the party can demonstrate that a fair and impartial trial is impossible in the court where the action was initially brought." *Smith v. Pearre*, 96 Md.App. 376, 383, 625 A.2d 349 (1993) (citing

---

12. Because the right of removal exists only in courts of law, there is no right of removal in equity cases. *Ezersky v. Ezersky*, 40 Md.App. 713, 715–16, 394 A.2d 1225 (1978). There is nothing to indicate that that was changed by the 1984 merger of law and equity.

*Ezersky, supra,* 40 Md.App. at 715, 394 A.2d 1225); *see also Pantazes v. State,* 376 Md. 661, 675, 831 A.2d 432 (2003). "If the condition for removal is satisfied, there is no discretion to deny the request." *Lennox v. Mull,* 89 Md.App. 555, 560, 598 A.2d 847 (1991). Thus, once a showing has been made of reasonable ground to believe the party cannot receive a fair and impartial trial, the court lacks discretion over *whether* to remove the case; the court does have discretion, however, over *where* to remove the case. *Smith, supra,* 96 Md.App. at 385 n. 4, 625 A.2d 349.

■■ The threshold question for the circuit court on a motion for removal—whether there is reasonable ground to believe the allegation that the moving party cannot receive a fair and impartial trial in the county in which the action is pending—is a mixed question of law and fact concerning a constitutional right. Accordingly, on appeal, we review that threshold determination *de novo. See Glover v. State,* 368 Md. 211, 220–21, 792 A.2d 1160 (2002) (reviewing *de novo* the judgment of the trial court on a motion to dismiss for violation of the right to a speedy trial); *Winder v. State,* 362 Md. 275, 310, 765 A.2d 97 (2001) (holding that whether the defendant's confession was voluntary was a mixed question of law and fact subject to *de novo* review); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000) (reviewing *de novo* the mixed question of law and fact of whether statements made by a suspect following a traffic stop should be suppressed because they were obtained in violation of the Fourth Amendment); *Johnson v. State,* 142 Md.App. 172, 183, 788 A.2d 678 (2002) (holding that the question of whether the police had reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo* ).

■ The implementing rule for removal in non-capital criminal cases, Rule 4–254(b)(2), is substantively identical to Rule 2–505. This Court has held, in the context of Rule 4–252(b)(2), that the party seeking removal bears the burden to show that he has been prejudiced by adverse publicity and that the *voir dire* examination available to him will not be

adequate to assure him a fair and impartial trial by jury. *Simms v. State,* 49 Md.App. 515, 518, 433 A.2d 1199 (1981); *Waine v. State,* 37 Md.App. 222, 227, 377 A.2d 509 (1977); *Mason v. State,* 12 Md.App. 655, 678, 280 A.2d 753, *cert. denied,* 263 Md. 717 (1971). Our interpretation of Rule 2–505 is likewise.

■ Returning to this case, to be sure, the documents submitted by Hoffman in support of his motion for removal showed that, in the months and years before the trial, there was widespread media coverage of the fraudulent practice of property "flipping," including coverage of the fraudulent acts perpetrated by appraisers who participated in "flipping" schemes. Yet, none of the articles or other media reports about "flipping" that Hoffman furnished the court in support of his motion drew a connection between the facts being reported and him, or this case. Indeed, the articles and other media reports did not concern the allegations in this case and did not mention Hoffman's name. They addressed "flipping" only in general terms.

Hoffman's assertion below, repeated in this Court, was to the effect that the general adverse media attention about appraisers committing fraud in "flipping" schemes in Baltimore City was so pervasive in the time period leading up to trial that *no* appraiser could receive a fair and impartial trial in that jurisdiction; and so, as an appraiser, he could not receive a fair and impartial trial in Baltimore City, and was entitled to have the case removed.

■ This assertion, and the proof offered by Hoffman to support it, clearly falls short of the standard requiring removal under Rule 2–505. The standard is a particularized one: the party seeking removal must allege, by affidavit, facts showing personal prejudice, *i.e.,* that "that party" cannot receive a fair and impartial trial. General, non-identifying media coverage about a type of wrongdoing that is not connected to the party seeking removal, except that it concerns the same type of wrongdoing he is accused of, is not, in and of

itself, reasonable ground to believe that that party, in particular, cannot receive a fair and impartial trial.

The right of removal rule derives from and protects the right to a fair and impartial jury for a party who by pervasive adverse media attention about the allegations against him has been tried and convicted in the press, so that the panels of potential jurors from the jurisdiction are likely to have prejudged the facts in his case. *See Stouffer v. State,* 118 Md.App. 590, 631–32, 703 A.2d 861 (1997), *aff'd in part and rev'd in part on other grounds,* 352 Md. 97, 721 A.2d 207 (1998) (affirming the denial of a suggestion of removal when the defendant failed to produce evidence that any juror was prejudiced by information he or she had gathered from the news coverage of the case); *Smith, supra,* 96 Md.App. at 387, 625 A.2d 349 (commenting that "[t]he media coverage of the case did not, apparently, intrude on the life of every Frederick County citizen so as to preclude the possibility of selecting an impartial jury").

The danger the removal right seeks to avert—individual jurors being so tainted by the media coverage of the particular case that they already have decided the party's legal fate based on the media-generated facts, and therefore will not decide it based on the facts put in evidence—is not implicated by general media coverage about a type of wrongdoing. Such coverage at most conveys the general notion that people who in fact commit certain wrongs are bad people; it does not prejudge the particular factual allegations against a party in a given case, or even suggest that a person merely accused of wrongdoing must be found liable or guilty. If that were the case, all murder defendants in Baltimore City would be entitled to have their cases removed on the ground that there is pervasive adverse media publicity in that jurisdiction about murderers; and therefore there is reason to believe that, as accused murderers, they cannot receive fair and impartial trials. That plainly is not a sufficient basis for removal.

Even in cases in which there has been media coverage of a particular crime, the fact of such coverage, standing alone,

is not sufficient to demonstrate a reason to believe the defendant on trial for the crime will not receive a fair and impartial trial. The defendant in such a circumstance must show not only that there has been publicity about his case but also that there is reason to believe the publicity about him will prejudice his rights. *Waine, supra,* 37 Md.App. at 227, 377 A.2d 509; *Cleveland v. State,* 12 Md.App. 712, 716–17, 280 A.2d 520 (1971). Here, Hoffman did not even show that the publicity in question was about him, let alone that it was prejudicial to him.

■ The *voir dire* process, not removal, serves the function of eliminating from the venire pool potential jurors who carry with them general prejudices, including prejudices that are a product of media coverage about crime and about civil wrongdoing in general. *See Smith, supra,* 96 Md.App. at 386, 625 A.2d 349 ("Because the purpose of removal is to eradicate local prejudice from the jury, *voir dire* may be used to weed out prospective jurors who are subject to such prejudice."). Hoffman offered nothing in support of his motion for removal to show that the *voir dire* process could not be used to address the general prejudices he thought might affect potential jurors, and he offers no argument on appeal that the *voir dire* process was not effective in doing so.

■ Finally, there is no merit in Hoffman's after-the-fact argument that the amounts of the punitive damages award against Beeman and AHOYO and the non-economic damages award against him and Irwin and Wood reveal such prejudice against him that it is clear that the circuit court erred by not removing the case from Baltimore City. Such circular reasoning was rejected by the Court of Appeals in *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 525, 682 A.2d 1143 (1996), in which the Court concluded that verdicts against the defendants in the case were not proof that defendants were prejudiced by the trial court's instructions to the jury.

We find no fault with the circuit court's determination that Hoffman did not demonstrate reason to believe that he could not receive a fair and impartial trial in Baltimore City.

## II.

### DENIALS OF MOTIONS FOR JUDGMENT AND FOR JNOV ON LIABILITY ISSUES

At the close of the buyers' case-in-chief, the appellants and the other defendants all moved for judgment on various grounds as to the claims in the amended complaint and punitive damages. The trial court denied the motions, except that it deferred its decision on punitive damages until the close of all the evidence. At the close of all the evidence, the motions were renewed. After hearing lengthy argument, the court denied the motions for judgment as to the three claims but granted Irwin, Wood, and Hoffman's motions respecting punitive damages.

After the jury returned a verdict in favor of the buyers, and after a separate punitive damages proceeding against the Beemans and AHOYO, the appellants and the other defendants all filed motions for JNOV. The buyers filed oppositions, and the court held a hearing. On May 13, 2002, the court issued a 39-page memorandum opinion denying the JNOV motions.

In a civil jury trial, if there is any evidence adduced, however slight, from which reasonable jurors could find in favor of the plaintiff on the claims presented, the trial court should deny the defendant's motion for judgment at the close of the evidence and submit the claims to the jury for decision. *See* Md. Rule 2–519. It is a question of law whether the plaintiff has introduced evidence sufficient to make his claim a jury issue. *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 209–10, 783 A.2d 194 (2001); *Glover v. State, supra,* 143 Md.App. at 321, 794 A.2d 735. In deciding this question, the trial court should view the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the plaintiff. Md. Rule 2–519(b); *see also Todd v. Mass Transit Admin.*, 373 Md. 149, 155, 816 A.2d 930 (2003).

When a party's motion for judgment is denied at the close of all the evidence, he may move for JNOV on the same grounds advanced in support of the earlier motion. *See* Md. Rule 2–

532. The trial court must decide the JNOV motion using the same analysis as if it were a motion for judgment made at the close of all the evidence. *See Jacobs v. Flynn*, 131 Md.App. 342, 353–54, 749 A.2d 174 (2000); *Weathersby v. Kentucky Fried Chicken Nat'l Mgmt. Co.*, 86 Md.App. 533, 552, 587 A.2d 569 (1991), *rev'd on other grounds*, 326 Md. 663, 607 A.2d 8 (1992). Thus, for purposes of appellate review, the issues of whether the trial court erred in denying motions for judgment and motions for JNOV are identical. *See Giant Food, Inc. v. Booker*, 152 Md.App. 166, 176, 831 A.2d 481 (2003); *Suburban Hosp., Inc. v. Kirson*, 128 Md.App. 533, 542, 739 A.2d 875 (1999). Because they are questions of law, we review them *de novo*. *Muthukumarana v. Montgomery County*, 370 Md. 447, 473, 805 A.2d 372 (2002).

### A.

### *Civil Conspiracy to Defraud*

 A civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal with the further requirement that the act or the means employed must result in damages to the plaintiff." *Van Royen v. Lacey*, 262 Md. 94, 97–98, 277 A.2d 13 (1971) (commenting that for a civil conspiracy to be actionable there must be a confederation of two or more people, some unlawful act done in furtherance of the conspiracy, and actual legal damage resulting to the victim-plaintiff); *Robb v. Wancowicz*, 119 Md.App. 531, 546, 705 A.2d 125, *cert. denied*, 350 Md. 278, 711 A.2d 869 (1998); *Yousef v. Trustbank Savings, F.S.B.*, 81 Md.App. 527, 538, 568 A.2d 1134 (1990).

 Conspiracy is not a separate tort capable of independently supporting an award of damages, absent other tortious injury to the plaintiff. *Alleco, Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 340 Md. 176, 189, 665 A.2d 1038 (1995); *Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc.*, 336 Md. 635, 645 n. 8, 650 A.2d 260 (1994); *NRT Mid–Atlantic, Inc. v. Innovative Properties, Inc.*, 144

Md.App. 263, 287, 797 A.2d 824 (2002). " '[A]n act which, if done alone, constitutes no ground of action on the case, cannot be made the ground of action by alleging it to have been done by and through a conspiracy of several.' " *Alexander & Alexander, supra,* 336 Md. at 645 n. 8, 650 A.2d 260 (quoting *Kimball v. Harman and Burch,* 34 Md. 407, 410–11 (1871)).

The principles controlling the admission of evidence to prove a criminal conspiracy and a civil conspiracy are the same, although the quantum of proof is different. *Larche v. Car Wholesalers, Inc.,* 80 Md.App. 322, 330, 562 A.2d 1305 (1989). To prove the existence of a conspiratorial agreement, it is enough to show that the conspirators came to a tacit understanding about the unlawful purpose; it is not necessary to show that they reached a formal agreement. *Acquah v. State,* 113 Md.App. 29, 50, 686 A.2d 690 (1996) (citing *Quaglione v. State,* 15 Md.App. 571, 579, 292 A.2d 785 (1972)).

The existence of a conspiracy may be shown circumstantially, "by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relations of the parties, their motives and all surrounding circumstances preceding and attending the culmination of the common design." *Daugherty v. Kessler,* 264 Md. 281, 292, 286 A.2d 95 (1972); *Vandegrift v. State,* 82 Md.App. 617, 640, 573 A.2d 56 (1990) (holding that evidence to prove a conspiracy need only be such that reasonable jurors could infer that the parties entered into an unlawful agreement). "The concurrence of action by the co-conspirators on a material point is sufficient to allow the jury to presume the concurrence of sentiment and, therefore, the existence of a conspiracy." *Hill v. State,* 231 Md. 458, 461, 190 A.2d 795, *cert. denied,* 375 U.S. 861, 84 S.Ct. 127, 11 L.Ed.2d 88 (1963); *see also Acquah, supra,* 113 Md.App. at 50, 686 A.2d 690. Once a conspiratorial agreement has been proven, "any act done by one of the conspirators is in legal contemplation the act of all." *Western Maryland Dairy, Inc. v. Chenowith,* 180 Md. 236, 243, 23 A.2d 660 (1942). Accordingly, " '[w]hen the mischief contemplated is accomplished, the

conspiracy becomes important, as it may affect the means and measure of redress. The party wronged may look beyond the actual participants in committing the injury, and join with them as defendants all who conspired to accomplish it[.]' "

 A civil conspiracy to defraud "is the confederation of two or more persons to cheat and defraud, when the design has actually been executed," thus harming the victim. *Check-et–Columbia Co. v. Lipman,* 201 Md. 494, 502, 94 A.2d 433 (1953). *See also Edison Realty Co. v. Bauernschub,* 191 Md. 451, 461, 62 A.2d 354 (1948); *Rent–a–Car Co. v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 260, 156 A. 847 (1931). A defendant who has entered into an agreement to defraud a plaintiff, with resulting actual damage, is liable to the defrauded plaintiff "irrespective of the degree of [that defendant's] activity in the fraudulent transaction or whether he shared in the profits of the scheme." *Etgen v. Washington County Bldg. & Loan Assoc.,* 184 Md. 412, 418, 41 A.2d 290 (1945). Because fraud must be proven by clear and convincing evidence, a civil conspiracy to defraud likewise must be proven by that standard.

### (i)

### *Irwin and Wood*

Irwin and Wood offer two arguments to support their contention that the trial court erred in denying their motions for judgment and JNOV on conspiracy to defraud.

 In their first argument, Irwin and Wood assert that a jury instruction the trial court gave about "willful blindness" had the effect of telling the jurors they could find that Wood (and hence Irwin) entered into a conspiratorial agreement with Beeman based solely on a finding that Wood knew about Beeman's fraudulent practices—without evidence of any conduct by Wood to support an inference that she entered into such an agreement. The buyers respond that the jury instruction had no such effect.

Irwin and Wood's second argument is tied into their first. Operating on the premise that the jurors were in effect instructed that they could infer, from a finding that Wood had actual knowledge, based on "willful blindness," of Beeman's fraudulent acts, that Wood and Beeman had entered into an agreement to defraud the buyers, they argue that there was no evidence other than such an inference to support a finding of a conspiracy, and therefore the evidence could not sustain a finding that they were part of a conspiracy, as a matter of law. They maintain that the evidence about Wood's conduct merely showed that she engaged in the ordinary business tasks of a loan officer. The buyers respond that there was evidence of conduct by Wood to support the jury's finding, by clear and convincing evidence, that she entered into a conspiratorial agreement with Beeman.

The Court of Appeals has recognized that willful refusal to know a fact, *i.e.*, "willful blindness" to a fact, is the equivalent of actual knowledge of that fact. *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 235 n. 10, 652 A.2d 1117 (1995); *Owens–Illinois v. Zenobia*, 325 Md. 420, 462 n. 23, 601 A.2d 633 (1992). *See also State v. McCallum*, 321 Md. 451, 458–61, 583 A.2d 250 (1991) (Chasanow, J., concurring) (observing that "knowledge exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth").

The trial court in this case instructed the jury about "willful blindness" as follows:

Now, in determining whether someone had knowledge of something you may look at all the evidence in the case and use your own common sense in determining whether that person really knew what was going on. You may draw reasonable inferences from facts but you must take care to avoid guess work or speculation. You may consider the willful and knowing violation of a known duty as evidence of such knowledge. *You may also consider whether the person involved willfully refused or deliberately refused to look at the facts in the face of obvious facts because*

*such willful refusal to know in the face of obvious facts may be deemed knowledge. If you find that a person was willfully blind or made a conscience [sic] effort not to know something than [sic] you may determine under all the facts in the case that the person actually knew it.*

(Emphasis added.) The instruction was not objected to by any party.

Irwin and Wood's first argument about conspiracy to defraud is a thinly disguised effort to challenge on appeal the "willful blindness" instruction, even though, not having been objected to, it is not properly subject to appellate review. Md. Rule 4–325(e); *Bowman v. State*, 337 Md. 65, 67, 650 A.2d 954 (1994). In any event, the "willful blindness" instruction, given as one of a series of preliminary instructions, simply informed the jurors of the legal concept of actual knowledge based on "willful blindness." It did not tell the jurors that a finding, based on "willful blindness," that Wood had actual knowledge of Beeman's fraudulent acts, could in and of itself support a further finding that Wood had entered into an agreement with Beeman to defraud the buyers. Indeed, the trial court gave the jurors a separate instruction about conspiracy to defraud, stating:

To prove there is a civil conspiracy to commit fraud it must be shown that there was, in fact, an agreement between two or more persons to accomplish fraud and that such fraud resulted in damage to the Plaintiffs. . . . The existence of a conspiracy may be shown by inference drawn from the nature of the acts complained of, the individual and collective interests of the alleged co-conspirators or conspirators, the situation and relationship of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of a common design. *The Plaintiff—each Plaintiff must, however prove by clear and convincing evidence that there was an actual agreement between two or more Defendants as well as intentional conduct of some kind by each such Defendant as a result of the agreement.* An agreement plus an act in furtherance of it. . . . The evidence must show from the Defendant's

own acts or statement that he or she was a willing participant. Once it's determined from the evidence that a conspiracy existed and that the Defendant that you're considering was one of the members then all of the acts and statements made in furtherance of the conspiracy and any during the—and during the existence of the conspiracy can be considered by you as evidence against all others of coconspirators even though the statements and acts may have occurred in the absence and without the knowledge of the Defendant.

(Emphasis added.) This instruction, which also was not objected to, properly explained the concept of a civil conspiracy, including that the buyers were required to show "an actual agreement [to defraud] between two or more Defendants."

 For the same reasons, the premise to Irwin and Wood's second argument is faulty. In addition, we agree with the buyers that there was ample evidence of *conduct* by Wood from which jurors reasonably could infer that Wood and Beeman entered into a conspiratorial agreement to defraud the buyers into purchasing and financing the properties at inflated prices.

To be sure, Wood testified that she merely was following an innocuous business routine in her every action in the relevant transactions: that by taking applications for FHA loans and processing them for potential buyers, she did nothing out of the ordinary and nothing that could not be explained by customary business practices. The jurors could have chosen to credit Wood's testimony, interpreting her actions innocently and disregarding the evidence that supported inferences that she was acting in step with Beeman. *See State v. Smith,* 374 Md. 527, 534, 823 A.2d 664 (2003); *Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993); *Brandon v. Molesworth,* 104 Md.App. 167, 197, 655 A.2d 1292 (1995) (observing that jurors are entitled to weigh the evidence, make credibility assessments, and accept all, some, or none of any given witness's testimony). On a sufficiency review, however, we must view the evidence and all reasonable inferences that could be drawn

from the evidence in the light most favorable to the verdict, which, in this case, means most favorable to the buyers.

Viewed in that light, the evidence showed that, at their initial lunch meeting, in early 1997, Wood taught Beeman the "ins and outs" of FHA lending. Wood knew then that Beeman was an investor whose business was buying and then selling residential properties; but that, in seeking out a lender such as herself, he was to some extent involving himself in the borrowing side of the transaction, which concerns the buyer. Wood also knew that, as the seller in a transaction, Beeman would be prohibited by FHA regulations from obtaining gifts or gift letters for buyer/borrowers. She nevertheless explained to him the process Irwin used for verifying gifts, and gave him blank gift letter forms. The jury reasonably could infer that, from the very outset of their relationship, Wood expected Beeman to have some sort of involvement in arranging gifts for buyers, if only to give them gift forms to use.

According to the evidence, the eight transactions at issue took place not long after Beeman and Wood established their relationship, and all within a six-month period. In each case, Beeman referred the financing transaction to Wood at a point in time after he had created the false impression for each buyer—by words and conduct—that he was representing the buyer in the purchase transaction, and was looking out for the buyer's interests.

At the initial meetings with Wood, notwithstanding her knowledge that Beeman was the seller in the transactions, Wood treated Beeman as if he *were* representing the buyers, by directing questions to him that properly should have been posed to the buyers and by accepting his answers on their behalves. This conduct ran contrary to the knowledge Wood had, as an experienced mortgage lender, about the role of the seller and lender *vis-à-vis* the buyer in such transactions. Wood's actions during the initial meetings were such as to validate the impression that Beeman's role in the transactions was as the buyer's representative. Reasonable jurors could find that Wood's conduct was not merely coincidental to

Beeman's pre-meeting conduct; rather, that Wood knew, before each initial meeting, that Beeman had led the buyer to think he was representing him (or her) and that, during the meeting, she was actively participating in that charade.

In all the transactions, Wood either knew from the documents or from Beeman's remarks in the initial meeting that the sales prices for the properties had not been established, were not clear, or were being changed. She participated in generating Good Faith Estimate documents showing monthly loan payment amounts calculated based on income, not on loans based on sales prices. In some of the transactions, Wood watched as Beeman, in the guise of acting on the buyers' behalves, used the Good Faith Estimates to persuade them to agree to sales prices that were not based on value. She tacitly gave credence to that method of establishing a sales price. In other of the transactions, Wood actively involved herself in using the Good Faith Estimates to generate or increase a contract price, performing calculations and conversing with Beeman to arrive at a price. Reasonable jurors could infer from this evidence and the evidence that Wood was experienced in and knowledgeable about real estate sales and mortgage financing; that she knew Beeman was using the Good Faith Estimates to generate inflated sale prices; that she was participating in a pretense designed to lend legitimacy to that practice; and that she was allowing Irwin's computer system to be used as a tool for Beeman to perpetuate a false impression about his role in the transaction and about sales pricing for consumer realty.

The evidence showed that Wood was familiar with the FHA regulations that prohibited Beeman from having any involvement in arranging gifts for sellers to use for closing or other costs in the transactions and any involvement in clearing buyers' credit problems. The evidence also showed, however, that Wood routinely listed "gift" as the source of funds needed for closing, even when she did not have information from the buyers from which to know that. This evidence raised a reasonable inference that Beeman was communicating directly with Wood about gifts and gift letters in these transactions.

In the initial meeting with Brower and Spencer, Wood and Beeman announced, in unison, that the problem of closing costs would be taken care of by "a gift letter"—without the buyers' participating in the discussion. Likewise, in the initial meeting with Inez Coward, Wood remarked, "there we go a gift again." These comments by Wood were fraught with meaning. They disclosed her understanding of what was taking place, as a matter of routine, in all the Beeman sales: that, regardless of the individual circumstances of the buyers, including their lack of financial resources, they were managing to come up with substantial gift money to enable them to consummate their purchases. From the evidence of that understanding and the evidence of Wood's conduct in educating Beeman about gifts and gift letters and furnishing him gift letter forms, reasonable jurors could infer that Wood knew all along that Beeman was arranging or in some manner facilitating the "gifts" necessary to make the transactions happen, in violation of federal law. Likewise, from the evidence that Wood furnished Beeman with information about the credit problems some of the buyers faced as obstacles to completing their transactions, reasonable jurors could find that Wood knew Beeman was playing a role in removing those obstacles, also in violation of federal law.

The jury had before it direct evidence of an established relationship between Wood and Beeman; of Beeman's deceptive conduct in roping the buyers into thinking he was advancing their interests when in fact he was positioning them to purchase dilapidated housing at inflated prices; that, in many of the initial meetings, Wood and Beeman spoke privately, and that, in all of the meetings, Wood treated the buyers as Beeman did; and that Wood and Hoffman, also an actor in all the transactions, had a long-standing relationship.

Not unlike many conspiracy cases, there was no direct evidence in this case of an agreement between Wood and Beeman to defraud the buyers. Yet, there was compelling circumstantial evidence that Wood was acting in step with Beeman in creating the impression for the buyers that what was false was true; and in enabling him to violate federal laws

to consummate the transactions, not because her innocent business routines happened to suit Beeman's scheme, but because she was part of the scheme and was acting in aid of its execution.

Reasonable jurors could find, by clear and convincing evidence, that Wood's behavior in the initial meetings with the buyers and in her interactions with Beeman only could be sensibly explained by her having reached an understanding with Beeman to use the meetings to deceive the buyers into agreeing to inflated sales prices and to misuse and violate the FHA mortgage financing process to accomplish closings in the buyers' transactions, when closings otherwise would not come to fruition (and profits therefore would not materialize). The evidence of Wood's conduct thus was sufficient to prove that Beeman and Wood (and hence Irwin) had entered into a conspiracy to defraud the buyers.

### (ii)

### *Hoffman*

■■■ Hoffman contends the trial court should have granted his motion for judgment and JNOV on the issue of conspiracy because there was not "a shred of evidence" to show he had entered into an agreement with Beeman to defraud the buyers. He maintains that, at most, the evidence established that in two of his eight appraisals—those for the 1127 Carroll Street and 5601 Force Road properties—Beeman gave him information about recent home sales in the neighborhoods that he then used as comparable sales for valuing the properties; and, as all the appraiser experts who testified at trial opined, it is an accepted practice in the appraising industry to use comparable sales as the basis for an opinion about a property's value. Hoffman maintains that he simply performed his appraisals at Irwin's request, with his $300 per appraisal fee in no way depending on the outcome of the appraisal, and that his limited contacts with Beeman and well-defined role with Irwin could not support a finding that there was a "meeting of the minds in an unlawful arrangement." He adds that the

evidence that in 1998 he discarded his files in these eight transactions was insufficient, in and of itself, to show that he had entered into a conspiratorial agreement.

The buyers respond that there was evidence that Hoffman participated in Beeman's fraudulent scheme; and that the jurors reasonably could have inferred from that conduct that Hoffman had reached an understanding with Beeman to perpetrate the fraud. They maintain that the adverse inference that permissibly could be drawn from Hoffman's destruction of his records was in addition to the affirmative evidence showing that he had entered into a conspiratorial agreement.

Again, in reviewing a sufficiency of the evidence contention, we consider the evidence adduced in the light most favorable to the verdict. *See Todd, supra,* 373 Md. at 155, 816 A.2d 930.

The evidence showed that for the Force Road property, Hoffman could not find any comparable sales in the immediate neighborhood to justify the $65,900 sales price. He resorted to using two comparable sales outside the immediate neighborhood and a comparable sale that he obtained from Beeman, of another Beeman property. The prior Beeman comparable was of a house that Beeman had purchased for $23,200 and then sold six weeks later for $75,000, in a transaction financed by a sub-prime lender. The transaction in that comparable sale had taken place within the prior year—but Hoffman's appraisal omitted that fact, representing, instead, that for that comparable sale there were "no other recent sales (none within 1 year)." For the Force Road property itself, even though Hoffman knew that Beeman had purchased the property for $24,000 only 20 days prior, Hoffman stated in his appraisal that there had been "no other recent sales."

Likewise for the Carroll Street property, Hoffman could not find any comparable sales in the immediate neighborhood to support the sale price of $58,000. He resorted to using three comparable sales furnished by Beeman. Two were prior sales by Beeman himself, and one was a prior sale by a business associate of Beeman. The properties all had been bought by Beeman (or his associate) in the prior year and quickly resold at huge profits. Yet, Hoffman falsely represented with re-

spect to those properties that there had been "no other recent sales (none within 1 year)." For the Carroll Street property itself, Hoffman stated, "Last Sale Unknown," even though the evidence showed he knew that Beeman had recently purchased the property for $7,500.

The evidence respecting these properties showed that when Hoffman could not justify contract sales prices by using comparable sales figures in the immediate neighborhoods, he went to Beeman and used information furnished by Beeman to justify the prices. Hoffman knew from the information at his disposal that, if the sales went through at the contract sales prices, they would result in huge profits to Beeman. Using information from Beeman, Hoffman fashioned the appraisal reports so as not to disclose that Beeman was the source of the data used to justify the contract sales prices and to conceal that the information in fact was tainted and unreliable. The evidence that Hoffman acted together with Beeman to craft misleading and inaccurate appraisals to justify inflated sales prices supported a reasonable inference that Hoffman was participating in a scheme with Beeman to trick the buyers into purchasing the properties at inflated prices. From the evidence that Hoffman was acting together with Beeman in carrying out the scheme to defraud, the jurors reasonably could conclude that Hoffman had entered into an agreement with Beeman and Wood to perpetrate the scheme.

Other evidence lent further support to that conclusion. Hoffman's appraisal of the Lenhart Street property stated that the house was built on a slab, despite the obvious presence of a crawl space. As it turned out, the crawl space was filled with standing water, a condition that, if disclosed, would have precluded FHA financing, and thus derailed settlement. In appraising the 41st Street property, which was a rowhouse, Hoffman used a comparable sale of a single family house in a neighborhood that was not nearby, and did not use comparable sales of rowhouses in the immediate neighborhood that would not have supported the contract sales price. For the Oldham Street property, Hoffman used a comparable sale of a house built 40 years after the subject property, and that

was located on the other side of the tunnel thruway. Hoffman acknowledged in his own testimony that his estimations of the distances between the subject properties and comparable properties in this case were inaccurate about 60% of the time. The buyers' expert witness in the field of home appraisals testified at length about the misleading entries in Hoffman's appraisals and that the values Hoffman arrived at for five of the eight properties greatly exceeded even the highest possible value ranges.

Hoffman's interactions with Beeman in performing these appraisals, quite apart from his later destruction of the pertinent records, supported a reasonable finding that he was actively participating in Beeman's scheme to sell the properties in question at inflated prices. Hoffman's conduct showed a "concurrence of action [with Beeman] on a material point" that was sufficient to allow the jurors to find "a concurrence of sentiment" and therefore a conspiratorial agreement. *Hill v. State, supra,* 231 Md. at 461, 190 A.2d 795. *See also Woods v. State,* 315 Md. 591, 618–19, 556 A.2d 236 (1989) (stating that evidence tending to show participating in a crime is sufficient so sustain a conspiracy conviction); *Levy v. State,* 225 Md. 201, 206, 170 A.2d 216 (1961) (finding evidence of a defendant's participation in the uttering of a false check sufficient to support his conspiracy conviction). The jury also was entitled to add to that evidence an adverse inference that the records Hoffman destroyed would have showed his participation in the fraud, and hence his conspiratorial agreement with Beeman.[13]

The evidence was sufficient to support the jury's finding, under a clear and convincing evidence standard, that Hoffman entered into a conspiracy with Beeman to defraud the buyers.

## B.

### *Fraud*

The elements of a civil action for fraud are:

---

**13.** Hoffman admitted destroying the records and knowing, when he did so, that his conduct was in violation of the ethical codes and uniform standards governing appraisers.

"(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Maryland Environmental Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512 (2002) (quoting *VF Corp. v. Wrexham Aviation,* 350 Md. 693, 703, 715 A.2d 188 (1998) (in turn quoting *Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660 (1994))); *see also Gross v. Sussex, Inc.,* 332 Md. 247, 257–58, 630 A.2d 1156 (1993); *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 333–34, 439 A.2d 534 (1982). The misrepresentation element of the tort of fraud may be based on an affirmative misrepresentation of fact; a concealment of fact, which includes a partially misleading disclosure; or a non-disclosure of fact in the face of a duty to disclose. *See Lubore v. RPM Assocs., Inc.,* 109 Md.App. 312, 329–31, 674 A.2d 547 (1996).

A person commits fraud by concealment when he engages in a deceptive act or contrivance intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. *U.S. v. Colton,* 231 F.3d 890, 898–900 (4th Cir.2000). When one intentionally produces a false impression to mislead another person, or to entrap or cheat him, or to obtain undue advantage of him, there is a positive fraud. *McKeever v. Washington Heights Realty Corp.,* 183 Md. 216, 225, 37 A.2d 305 (1944). Concealment of a fact can be the basis for fraud when the concealment

is effected by misleading and deceptive talk, acts, or conduct, or is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part, which tends affirmatively to the suppression of the truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts.

*Schnader v. Brooks,* 150 Md. 52, 57–58, 132 A. 381 (1926) (citations omitted); *see also Lubore, supra,* 109 Md.App. at 330, 674 A.2d 547.

The elements of the tort of fraud must be proven by clear and convincing evidence. *VF Corp., supra,* 350 Md. at 704, 715 A.2d 188 (quoting *Gross, supra,* 332 Md. at 257–58, 630 A.2d 1156; *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882 (1986)).

### (i)

### *Irwin and Wood*

Irwin and Wood's challenge to the trial court's denials of their motion for judgment and motion for JNOV on the fraud claim also is two-fold. First, they argue that there was no evidence to support a finding that Wood made a misrepresentation of fact, one of the elements of a fraud claim. The buyers respond that, to satisfy the misrepresentation element of the tort of fraud, it is enough to prove a statement made or conduct performed for the purpose of creating a false or misleading impression of a material fact, by concealing the truth; and that the evidence against Wood was sufficient on that point.

Second, in a somewhat convoluted argument, Irwin and Wood renew their indirect attack on the trial court's "willful blindness" instruction, arguing that the instruction gave the jury free reign to find the "knowledge of falsity" and *scienter* elements of the tort of fraud against Wood on legally insufficient evidence. The buyers respond that the "willful blindness" jury instruction was not objected to and in any event the evidence at trial was sufficient to support a reasonable finding of knowledge of falsity and intent to deceive on Wood's, and therefore Irwin's, part.

Because, for the reasons we have discussed, the evidence was sufficient to support the jury's finding that Irwin and Wood conspired with Beeman to defraud the buyers, and because the evidence plainly established (and it is not disput-

ed) that Beeman defrauded the buyers, Irwin and Wood properly were held liable for fraud. We also conclude, however, that there was sufficient evidence against Irwin and Wood to make them independently liable for fraud, irrespective of the conspiracy finding.

As noted above, in *Schnader, supra*, the Court of Appeals recognized that "[f]raud may consist of the suppression of the truth as well as the assertion of a falsehood." *Id.* at 57, 132 A. 381. In *Lubore, supra*, this Court added to the discussion of when a concealment or non-disclosure will amount to fraud:

> [O]rdinarily when one owes no legal obligation to speak, mere silence is not actionable; but if what is stated amounts to a "partial or fragmentary" disclosure, that misleads because of its incompleteness, the "legal situation is entirely changed." *Brager v. Friedenwald*, 128 Md. 8, 31–32, 97 A. 515 (1916). *See also* Prosser & Keaton, LAW OF TORTS § 106, at 738 (1984)("if the defendant does speak, he must disclose enough to prevent his words from being misleading....") RESTATEMENT (SECOND) OF TORTS § 551, cmt. g ("A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not.... When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.").

109 Md.App. at 330–31, 674 A.2d 547.

In a recent case discussing a claim of fraud by concealment, the federal district court in Maryland, applying Maryland law, further explained:

> In order to prevail on a claim of intentional misrepresentation by concealment, or fraudulent concealment, Plaintiff must prove the following elements: (1) Defendant owed Plaintiff a duty to disclose a material fact; (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifi-

able reliance on the concealment; and (5) Plaintiff suffered damages as a result of the Defendant's concealment. *See Green v. H & R Block, Inc.,* 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999)(citing *Finch v. Hughes Aircraft Co.,* 57 Md.App. 190, 231–32, 469 A.2d 867, 888 (1984)). Plaintiff must prove either that Defendant had a duty to disclose a material fact to them and failed to do so, or that Defendant concealed a material fact for the purpose of defrauding Plaintiff. . . .

\* \* \* \*

In the context of a claim of intentional misrepresentation by concealment, a duty to disclose arises where the defendant makes an active misstatement of fact, or only a partial or fragmentary statement of fact, which misleads the plaintiff to its injury. *See Lubore* [, *supra,* 109 Md.App. at 330–31, 674 A.2d 547]; *Walsh v. Edwards,* 233 Md. 552, 557, 197 A.2d 424, 426–27 (1964).

*Odyssey Travel Ctr. v. RO Cruises, Inc.,* 262 F.Supp.2d 618, 628–29 (D.Md.2003)(footnote omitted).

Here, as we have explained, there was evidence showing that Wood participated in creating a number of false impressions for the buyers, by words and conduct amounting to partial and fragmentary disclosures. First, in conducting each initial loan application meeting, Wood treated Beeman, whom she knew to be the seller in the transaction, as if he were the buyer's representative. She engaged Beeman in discussion that validated one of two false impressions: either that Beeman was not the seller in the transaction, when he was, or that it was a permissible business practice for the seller to be taking on the role of buyer's representative.

Second, Wood actively participated in using the Irwin computer system to generate and then misuse Good Faith Estimates to set or increase the sales prices for the properties. The jury could have inferred from the circumstances surrounding many of the initial meetings that the buyers did not understand mortgage financing and that an arm's length

negotiation of a sales price is rarely arrived at by working backward from a monthly payment—and Wood knew they did not understand that. Yet, she participated with Beeman in misusing the Good Faith Estimate forms to create and then perpetuate that misimpression, and either establish sales prices not yet negotiated or inflate already agreed to sales prices—all to Beeman's financial benefit. At the same time, Wood did not inform the buyers of Beeman's actual role in the transaction, of the impropriety of the role he was assuming, and that the Good Faith Estimate process was being misused to the buyers' detriment.

Finally, Wood's statements and conduct during the initial meetings contributed to misleading the buyers into thinking it was proper for Beeman to be arranging gift letters, and hence gifts, to effectuate the transactions. On several occasions, Wood included a gift letter as part of the application, without any confirmation by the buyer. Other times, Wood raised the prospect of a gift letter, and directed the issue to Beeman, not the buyer. Yet other times, Wood and Beeman in unison announced, in front of the buyer, that a gift would be part of the transaction. Wood thus conducted herself before the buyers so as to make it seem acceptable for Beeman to be involved in making a gift happen in each case. She did this, all the time knowing that Beeman was prohibited by federal regulations from having anything to do with the buyers' obtaining gifts to effectuate closings. By her words and conduct, Wood gave the buyers enough information about the gift letter process to know it could be part of a prescribed plan of action for obtaining financing, but not enough information to know that it was improper for Beeman to be involved in the process. Wood thus made partial and fragmentary disclosures that created and perpetuated a false impression, and were misleading.

For these reasons, the evidence was sufficient to support a finding against Wood (and hence Irwin) on the misrepresentation element of the tort of fraud.

In their second argument, Irwin and Wood complain that because (in their view) there was no false represen-

tation by Wood, the only "knowledge of falsity" the jury could have found on her part was her knowledge, based on the legal concept of "willful blindness," of false representations by Beeman. They argue that mere knowledge by Wood that Beeman was making false representations could not support a finding that she knew of the falsity of her own representations (of which, they assert, there were none) or that she acted with an intent to deceive the buyers.[14]

In the context of the fraud claim against Irwin and Wood, "knowledge of falsity" meant that Wood knew that the impression she was creating about Beeman's proper role in the transactions, both as the buyer's representative and as the facilitator of gifts, and about the method for setting sales prices, was false; that is, she was consciously aware that she was creating a false impression. Reasonable inferences from the evidence supported that finding. From the evidence about Wood's experience as a loan officer, the jurors could find that she knew that neither her role nor Beeman's role as the seller properly included using a Good Faith Estimate form to create or increase sales prices; but, that the impression she was creating by her conduct in the initial meetings with the buyers was exactly the contrary. Wood testified that she was familiar with the federal regulations making it illegal for Beeman to participate in arranging gift letters and gifts. The jurors could infer from Wood's conduct validating Beeman's involvement in the gift letter process that she knew she was drawing a picture about that process that was inaccurate.

With respect to the *scienter* element of fraud, from a finding that Wood knew she was creating a false impression for the buyers, the jurors reasonably could conclude that Wood did so with the intent to deceive them into accepting the impression as true, so they would act in conformity with it. *See Ellerin, supra,* 337 Md. at 230, 652 A.2d 1117 (explaining that the

---

14. In advancing this argument, Irwin and Wood again attempt to challenge, indirectly, the trial court's unobjected to "willful blindness" instruction.

intent to defraud element of a fraud claim can be satisfied by proof of " 'a falsehood knowingly told, with an intention that another should believe it to be true and act upon it' " (quoting *McAleer v. Horsey,* 35 Md. 439, 453 (1872))).

The jury may well have employed the legal concept of "willful blindness" to find that Wood had actual knowledge of Beeman's fraudulent acts—specifically, that he was giving money to "donors" to establish bogus "gifts," without which the properties could not go to settlement. The evidence independently showed that Wood knew, from the buyers' financial situations, that gifts would be necessary to complete the settlements; that, without information from the buyers, she designated the transactions as involving gift letters; that she further knew that Beeman was insinuating himself into the gift letter process, in violation of federal regulations; and that she validated Beeman's conduct by acting in step with him at the initial meetings. These circumstances supported a logical inference that Wood knew Beeman was taking steps to arrange for "gifts" in these transactions. Jurors reasonably could conclude from the evidence that, if Wood did not in fact know that Beeman was enabling and creating false gifts, her supposed lack of knowledge was a result of turning a blind eye: hence, she had actual knowledge of those facts.

Actual knowledge by Wood that Beeman was making misrepresentations to the buyers and was engaging them in a false gift process was a fact, in the total circumstances, that lent support to a finding that Wood knew the impressions *she* was creating in the initial meetings were false and that she was creating the false impressions with a mind for deception. Wood's knowledge of Beeman's wrongful conduct was not the sole basis in the evidence for a reasonable jury to find against Wood on the knowledge of falsity and *scienter* elements of fraud, however.

### (ii)

### Hoffman

Hoffman contends there was no evidence that any buyer in fact relied on his appraisal reports before going

forward with the sale; therefore, the evidence was legally insufficient to prove the reliance element of the tort of fraud. He points out that the evidence showed the buyers did not read the appraisal reports. Hoffman further argues that even if the buyers did rely on his appraisal, they had no right to do so. While the FHA financing clauses in their contracts gave them the right to cancel if the appraised values did not meet the contract prices, the clauses also stated that the appraisals were being performed for the benefit of HUD, not the purchasers. Therefore, the buyers were required to independently satisfy themselves about the value and condition of the properties they were purchasing, apart from any appraisals by him.

The buyers respond that the evidence was sufficient to prove reasonable reliance by them on Hoffman's appraisals.

Again, Hoffman was subject to liability for the fraudulent scheme perpetrated by Beeman against the buyers because the evidence supported a finding that Hoffman conspired with Beeman to defraud the buyers. The evidence also supported a finding of fraud against Hoffman independently.

In advancing the first part of his argument, Hoffman relies on *Parlette v. Parlette*, 88 Md.App. 628, 596 A.2d 665 (1991). There, the plaintiff sued her ex-husband for fraud, alleging that he had made false representations to her late son that induced him to name him (the ex-husband), rather than her, as the beneficiary of his life insurance policy. Affirming the circuit court's decision to grant a motion for judgment and declaratory judgment in the ex-husband's favor, we held that the plaintiff could not have relied on the alleged misrepresentations by her ex-husband because she "was not a party to any misrepresentations made by [the defendant] to [the son]" and did not know about the representations until after the son died. *Id.* at 635, 596 A.2d 665.

*Parlette* is inapposite. In that case, there was no evidence that the alleged misrepresentations were made to the plaintiff, directly or indirectly, or that she knew of them before the critical point at which her son's death triggered the policy

benefits. Here, Hoffman's misrepresentations about the values of the properties were made before the critical times of the settlements and were communicated to the buyers, indirectly, by the mere availability of financing to complete the transactions. Had the properties not been appraised at or above their contract values, the sales would have fallen through. Thus, there was evidence on which the jurors reasonably could find actual reliance by the buyers on Hoffman's inflated and false appraisal values.

As to the second aspect of Hoffman's reliance argument, whether the buyers acted reasonably in so relying was a jury question. The admonitions in the FHA financing language, read in isolation, could support a conclusion that the buyers did not act reasonably. Yet, the contracts all contained clauses allowing the buyers to cancel the sales if the properties did not appraise for the contract prices, based on the appraisals obtained by the lender. Necessarily, the buyers were entitled to rely on the appraisals in that regard. Considering the total evidence, then, the jurors rationally could conclude, by a clear and convincing standard, that the buyers acted reasonably in relying on their appraisals' statements of value in deciding not to exercise their cancellation rights.

## C.

### *Maryland Consumer Protection Act*

Maryland's Consumer Protection Act, Md.Code (2000 Repl Vol.), Com. Law § 13–101, *et seq.,* prohibits unfair and deceptive trade practices in the sale of consumer real estate, *id.* § 13–303(1), and in the extension of consumer credit, including the financing of consumer realty. *Id.* § 13–303(3). Unfair and deceptive trade practices include failing to state material facts; making false, falsely disparaging, or misleading oral or written statements that have the capacity, tendency, or effect of misleading consumers; and knowingly concealing or omitting material facts with the intent that consumers rely on the same. *See id.* § 13–301; *Hartford*

*Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,*
109 Md.App. 217, 242, 674 A.2d 106 (1996), *aff'd.* 346 Md. 122,
132, 695 A.2d 153 (1997). When the unfair and deceptive
trade practice is a representation or omission of fact, it must
be material, that is, it must concern " 'information that is
important to consumers and, hence, likely to affect their choice
of ... a product.' " *Luskin's Inc. v. Consumer Prot. Divi-
sion,* 353 Md. 335, 359, 726 A.2d 702 (1999) (quoting *In re
Cliffdale Assocs., Inc.,* 103 F.T.C. 110, 165–66 (1984)). The
plaintiff also must prove that the defendant knew of the falsity
of the statement or omission and intended to induce reliance
by the plaintiff. Upon a showing of reasonable reliance, the
plaintiff may recover any actual losses. *Citaramanis v. Hal-
lowell,* 328 Md. 142, 157, 613 A.2d 964 (1992).

### (i)

### *Irwin and Wood*

Irwin and Wood contend that the buyers failed to
prove any of the statutory elements necessary to support a
finding that they violated the MCPA. They suggest that the
evidence merely proved that Beeman engaged in questionable
practices in connection with the sales of the properties to the
buyers, and that the buyers themselves admitted that they
participated in Beeman's fraud by knowingly signing false gift
letters. Revisiting their arguments as to why the fraud claim
was unsupported by the evidence, Irwin and Wood assert that
the evidence was insufficient to prove that they knowingly
engaged in an unfair and deceptive trade practice with the
intention of inducing reliance; that such trade practice was
somehow material to a choice that the buyers made; that the
buyers in fact relied reasonably; or that the buyers suffered
actual losses as a result. In addition, noting that the state-
ment or omission must be false or misleading to a *reasonable*
consumer, they argue that the buyers could not have reason-
ably concluded that false gift letters were somehow permissi-
ble.

The buyers respond that the evidence supported a reasonable finding that Irwin and Wood committed unfair and deceptive trade practices in assisting Beeman in deceiving them.

As Irwin and Wood acknowledge, the buyers' MCPA claim depended on proof that they relied to their detriment on a material misrepresentation or omission by Wood. For the reasons we have given, we are satisfied that the jury reasonably could have concluded that Wood created a false impression suggesting that false gift letters based not on actual gifts but on a bogus gift arrangement made by the seller was a permissible practice, and that the buyers were justified in relying on that impression in deciding to go along with Beeman's scheme. We also acknowledge Irwin and Wood's argument that the consumer must be deemed to have acted reasonably in relying on the misrepresentation or false impression, citing *Luskin's, supra,* 353 Md. at 365, 726 A.2d 702, and that the consumer's sophistication does not necessarily affect the determination of what is reasonable. We think, however, that the jury could have concluded that a reasonable consumer, whether sophisticated or not, would have relied on the false impressions created by Wood. Thus, we affirm the jury's verdict on the MCPA claim against Irwin and Wood.

### (ii)

### *Hoffman*

 Relying on *Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624 (1995), Hoffman argues that there was insufficient evidence to prove that he violated the MCPA because, as an appraiser, he did not offer consumer services, sell consumer realty, or extend consumer credit, all of which fall within the statute's coverage. He argues that, because he was working for Irwin, and not the buyers, and because his appraisals were for the exclusive use of Irwin, his conduct was too remote from the sales or financing of the properties to implicate the MCPA. The buyers respond that the facts in this case, which showed that Hoffman's conduct was necessary

to allow completion of the sales and financing of the consumer realty to them, distinguish it from *Morris*.

In *Morris*, the plaintiffs brought a class action suit against plywood manufacturers to recover the cost of replacing the roofs of their townhouses, which were made with allegedly defective fire retardant plywood. The suit stated five counts—strict liability, negligence, breach of implied warranties, negligent misrepresentation, and violations of the MCPA. The plaintiffs alleged that each defendant had advertised its product as suitable for constructing roofs. The circuit court dismissed all of the plaintiffs' claims.

On appeal, as to the MCPA claims, the Court of Appeals reviewed whether the allegations were "sufficient to establish that the defendants engaged in unfair and deceptive trade practices in connection with sales, offers for sale, or attempts to sell consumer goods." *Id.* at 538, 667 A.2d 624. It concluded that they were not. Relying on principles of statutory construction, the Court reasoned that "the sale of consumer goods," for purposes of the MCPA, is limited to a sale in which the buyer intends to use the goods primarily for personal, family, household, or agricultural purposes. *Id.* at 540–41, 667 A.2d 624. Applying that rule to the facts of the case, the Court held that dismissal was appropriate because the allegedly deceptive practices by the manufacturers occurred entirely in the course of their marketing the plywood to the builders, who intended to use it for commercial, rather than consumer, purposes. There was no allegation that the manufacturers were in any way involved in selling, offering to sell, or advertising the townhouses purchased by the plaintiffs. Therefore, the "remote effect on the sale of consumer realty [was] not sufficient for [the Court] to conclude that the deceptive trade practice actually occurred in that sale." *Id.* at 542, 667 A.2d 624 (pointing out that "[t]he only effect the alleged misrepresentations had on the sale of the townhouses was the creation of a possibly erroneous belief on the part of the builders which caused them to include allegedly inferior products in the townhouse.").

The Court observed, however, that "[i]t is quite possible that a deceptive trade practice committed by someone who is not the seller [of consumer realty] would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale." *Id.* at 541, 667 A.2d 624. (providing examples from other cases, such as a Pennsylvania consumer's action against a finance company that assisted a pool sales company in fraudulently obtaining mortgage deeds on consumers' homes).

The case at bar is such a case. Hoffman's appraisals were so vital to the sales of consumer realty here that his conduct in performing them was the equivalent of conduct committed "in" the sale, for purposes of the MCPA. Unlike the defendants in *Morris*, who produced the plywood to be used for any purpose for which plywood is suitable, and who in no way participated in influencing the plaintiffs' decisions to purchase consumer realty, Hoffman knew, from his familiarity with FHA regulations, that his appraisals were critical to effectuate the sales. Moreover, the evidence showed that, without the inflated appraisals, the sales would not have transpired. Accordingly, the evidence was sufficient to support a reasonable finding that Hoffman engaged in unfair and deceptive trade practices in making material misrepresentations about value in the appraisals.

## D.

### *Affirmative Defense of Fraud*

Irwin and Wood contend the trial court erred by not granting their motion for JNOV on the affirmative defense of fraud. They argue that the evidence established that the buyers knowingly participated in furnishing false gift letters to Irwin to induce Irwin to extend FHA mortgage financing to them; and that reasonable jurors could find from that evidence only that the buyers were themselves committing fraud, and therefore were barred from recovering against them for conspiracy to defraud or fraud. In short, Irwin and Wood contend that the evidence of fraud by the buyers was so clearly in their

favor that it should not have been submitted to the jury to decide.

The buyers respond that whether they had the necessary *scienter* to satisfy the elements of fraud was a question of fact; therefore, the issue of fraud on their part was properly ruled a jury question.

■ In Maryland, fraud is an affirmative defense that, if proven, bars a plaintiff from recovering. *See* Md. Rule 2–323(g). Like an affirmative claim of fraud, the affirmative defense of fraud requires a showing, by clear and convincing evidence, of detrimental reliance on a knowingly false representation, made with an intent to deceive. The showing must be made by the defendant, however, against the plaintiff.

■ This issue was not properly presented to the trial court on a motion for JNOV, and therefore was not properly preserved for review in this Court. The issue was not raised in a motion for judgment at the conclusion of the defense case or the entire trial. Rather, it was raised for the first time in Irwin and Wood's motion for JNOV. Yet, Rule 2–532(a) plainly states that, "[i]n a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." The rule was not satisfied here.

■ If we were to address the issue, however, we would agree with the buyers that, with respect to the affirmative defense of fraud, the evidence at trial generated a question of fact on the issue of *scienter*, at the very least. The jurors reasonably could have concluded that the buyers did not cooperate with Beeman in the false gift letter effort with an intention to deceive Irwin and Wood. The evidence supported an inference that the buyers inaccurately thought that the gift letters were a standard means of effectuating closings, and that Wood knew that gift letters, based on inaccurate information, were being used to effectuate the settlements. That evidence tended to negate the intent to deceive element of the

fraud defense. Accordingly, the trial court did not err in denying the motion for JNOV on the affirmative defense of fraud.

## III.

### DENIALS OF MOTIONS FOR JUDGMENT AND JNOV AND MOTION FOR NEW TRIAL OR REMITTITUR ON NON-ECONOMIC DAMAGES ISSUES

In connection with conspiracy to defraud and fraud, the trial court instructed the jurors about non-economic damages as follows:

> In addition to the economic injury, if any you find, you may consider any non-economic injury which you find is proximately and directly caused. In determining non-economic damages, you may consider any mental pain, anguish, humiliation, nervousness, stress and insult to which that Plaintiff has been subjected and which was the direct result of the conduct of one or more Defendants. Again, your award must not be based on guess work but must fairly and adequately compensate each Plaintiff that you find in favor or for the injury that each Plaintiff you find has sustained.

As noted above, the jury awarded $145,000 in non-economic damages to each buyer, for a total of $1.305 million.

The appellants raise a number of contentions about the non-economic damages, all of which fall into two categories.[15] First, they argue that the jury's damages award for emotional distress was not supported by adequate evidence, because the buyers did not introduce proof that their injuries were "objectively determinable." They maintain that, under the rule articulated in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), the buyers could not recover non-economic emotional distress damages absent evidence of "outward manifestations"

---

15. Procedurally, the appellants challenge the court's instructions to the jury, as well as its denial of their motions for judgment, JNOV, new trial, and remittitur, as they pertain to the issue of non-economic damages.

of their psychic injuries. The buyers respond that proof of an objective manifestation of an emotional injury is not required in a fraud action.[16]

Second, the appellants argue that the non-economic damages award was improper because it was founded at least in part on loss of credit, which is an inherently speculative loss, and was not supported by the evidence in any event. The buyers counter that they did not seek and were not awarded damages for loss of credit or repair to their damaged credit. Rather, they offered evidence of the humiliation, anxiety, stress, and embarrassment they endured as a consequence of having their credit damaged to show, in part, that they suffered emotional distress as a result of the appellants' fraudulent practices.

## A.

### *The "Physical Injury Rule"*

In *Vance v. Vance, supra,* the Court of Appeals upheld an award of damages for emotional distress in a negligent misrepresentation case. The defendant had falsely misrepresented to the plaintiff that he was divorced and therefore free to marry; and on that basis, the two had participated in a marriage ceremony and lived together as though married. The plaintiff later learned, in the course of divorce proceedings, that her "husband" had been married when they "married," so they were never married at all. At trial, the plaintiff presented evidence that, upon learning that she and the defendant were never married, she could not function, could not sleep, had difficulty communicating and socializing with other people, and spent "long periods of time crying and

---

16. As explained above, a conspiracy to defraud claim cannot independently result in an award of damages absent proof that fraud was committed and the plaintiff suffered actual damage as a result. The buyers in this case were awarded damages for fraud, and were not awarded separate damages for conspiracy, for that reason. The questions the appellants present on appeal concerning non-economic and economic damages therefore pertain to the fraud claim.

sobbing." *Vance, supra,* 286 Md. at 493–94, 408 A.2d 728. No medical evidence was presented to support the plaintiff's claim of emotional distress.

The jury awarded the plaintiff $50,000 in damages. The trial court granted a JNOV, on the ground that the plaintiff had not offered evidence of a physical injury sufficient to support an award of damages for emotional distress in a negligence case.

On review, the Court of Appeals held that the evidence was sufficient to support the award of damages for emotional distress. The Court discussed the history of what is known as the "physical injury rule," beginning with *Green v. T.A. Shoemaker & Co.,* 111 Md. 69, 73 A. 688 (1909). That case held that it was not necessary for a plaintiff in a negligence action to prove a physical impact, in order to recover damages for emotional distress; rather, it was sufficient for the plaintiff to show that the negligence had caused him some "physical injury." Later, in *Bowman v. Williams,* 164 Md. 397, 165 A. 182 (1933), the "physical injury rule" was clarified to mean that a plaintiff can recover damages for emotional distress in a negligence action, in the absence of a physical impact, when the emotional distress has "resulted in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicated of a resultant pathological, physiological, or mental state." *Vance, supra,* 286 Md. at 500, 408 A.2d 728 (quoting *Bowman, supra,* 164 Md. at 404, 165 A. 182).

The Court in *Vance* explained that the underlying purpose of the "physical injury rule" is to "requir[e] objective evidence to guard against feigned claims." 286 Md. at 500, 408 A.2d 728. Therefore, "[i]n the context of the *Bowman* rule . . . the term 'physical' is not used in its ordinary dictionary sense. Instead, it is used to represent that the injury for which recovery is sought is capable of objective determination." *Id.* Evidence indicative of a "mental state" is sufficiently objective to prove a physical injury, as that term is used in *Bowman.* On that basis, the Court concluded that the evidence intro-

duced by the plaintiff at trial was sufficient to support the award of damages for emotional distress for negligent misrepresentation.

The buyers acknowledge the "physical injury rule" but argue that it applies only in negligence cases, not in intentional tort cases. In support, they cite *Laubach v. Franklin Square Hospital*, 79 Md.App. 203, 556 A.2d 682 (1989).

In *Laubach*, a jury found that the defendant hospital violated a provision of the Health General Article by refusing to give the plaintiffs a medical record created in the course of plaintiff wife's treatment, within a reasonable time after the plaintiffs requested it. The plaintiffs introduced evidence that the hospital's statutory violation caused them mental distress; there was no evidence that they suffered physical manifestations of the distress, however. The jury awarded the plaintiffs compensatory and punitive damages.

On appeal, the hospital argued *inter alia* that, under the "physical injury rule," as explicated in *Vance,* the evidence was insufficient to support the award of compensatory damages for emotional distress. In rejecting that argument, we explained that, because the statute proscribed an intentional act (refusal to disclose), not a negligent act, the "physical injury rule" was not implicated:

> [T]he conduct which forms the basis for the cause of action is more closely akin to intentional torts than to negligent acts [ . . . ] There was no need for [the plaintiffs] to prove physical injury of the sort required by the Court in *Vance, supra.* It was sufficient that the emotional distress and mental suffering were elements of damages emanating directly from the intentional conduct of the hospital in refusing to disclose the [medical record.]

79 Md.App. at 219, 556 A.2d 682.

We observed that "emotional distress may form the basis for the recovery of actual damages where the emotional distress arises from an intentional tort, such as libel, slander, malicious prosecution, fraud, and the like." *Id.* at 217, 556 A.2d 682 (citing *H & R Block, Inc. v. Testerman,* 275 Md. 36,

48–49, 338 A.2d 48 (1975)(commenting, in the course of affirming a trial court's denial of damages for emotional distress in a negligence action, that mental suffering is a proper element of damages when the act causing the injury was "inspired by fraud, malice, or like motives"); *Zeigler v. F Street Corp.*, 248 Md. 223, 225–26, 235 A.2d 703 (1967) (commenting, in the course of affirming the dismissal of a wrongful death case in which the decedent's wife was claiming he died as a consequence of emotional distress due to enduring the defendant's damage to his real property, that "[w]here ... the act occasioning the injury to the [plaintiff's] property [was] inspired by fraud, malice, or like motives, mental suffering is a proper element of damage"); and *Davis v. United States Dept. of Army*, 602 F.Supp. 355, 360 (D.Md.1985) (stating that "recovery for negligent, as opposed to intentional infliction of emotional harm must be accompanied by a physical invasion")). Our holding recognized that intentional misconduct that forms the basis for an intentional tort is conduct that one expects, by its very nature, to produce emotional distress in the victim.

In the case at bar, we agree with the buyers that the "physical injury rule" had no application to their fraud claim. As the Court in *Vance* made plain, the rule was fashioned in a series of negligence cases for the purpose of minimizing feigned claims for damages for emotional distress.[17] The rule permits recovery when the emotional distress claimed is not parasitic to an actual physical injury; the defendant's conduct itself (carelessness) does not give reassur-

---

**17.** We note, moreover, that in *Belcher v. T. Rowe Price Foundation, Inc.*, 329 Md. 709, 722, 621 A.2d 872 (1993), although not presented with the question, the Court of Appeals recognized that the "physical injury rule" is peculiar to negligence cases. It remarked, *"Vance's* explication of the [physical injury rule described in] *Bowman* is, at this time, the definitive Maryland case on mental distress as the basis of damages *in negligent tort actions."* (Emphasis added). *See also Hunt v. Mercy Medical Center*, 121 Md.App. 516, 524, 710 A.2d 362 (1998)(observing that, *"[w]ithin the field of negligence law*, the rule in Maryland is that any 'physical injury' is compensable if that injury is 'capable of objective determination' "*)* (emphasis added) (quoting *Belcher v. T. Rowe Price Found., Inc., supra*, at 734, 621 A.2d 872).

ance that the plaintiff in fact experienced emotional distress; but there is some objective proof to support such a finding.

As the Court in *Laubach* recognized, unlike in a tort case founded on negligence, in a tort case based on intentional misconduct, such as fraud, proof that the defendant committed the wrong alleged is sufficient reassurance that the plaintiff's claimed emotional distress is not feigned, because the wrongful conduct ordinarily would cause emotional distress in the victim. For that reason, there is no need for the plaintiff to support his claim of emotional distress with objective evidence of a physical injury. It is only necessary that the plaintiff prove "that the emotional distress and mental suffering were elements of damages emanating directly from the intentional conduct of the [defendant]. . . ." *Laubach, supra,* 79 Md.App. at 219, 556 A.2d 682. *See also Empire Realty Co., Inc. v. Fleisher,* 269 Md. 278, 284, 305 A.2d 144 (1973) (noting that "[o]ne suing for fraud or deceit must establish that he sustained damages by reason of the fraud, and that his injury was the natural and proximate consequence of his reliance on the fraudulent act") (citations omitted).

 Here, the buyers alleged and introduced evidence to show that they were the victims of a deceptive scheme to trick them into buying deteriorating properties at inflated prices. The buyers presented evidence showing that they sustained actual, economic damages as a result of the fraud practiced upon them. In addition, they each testified that, as a consequence of the successful scheme, they experienced emotional distress, in the form of anxiety, humiliation, and embarrassment. The buyers were not required to introduce objective evidence, under the "physical injury rule," to support their claims that they suffered emotional distress as a consequence of being fraud victims. Proof of the appellants' misconduct was sufficient to validate the buyers' subjective evidence that they experienced emotional distress. It was enough that the buyers proved that the appellants perpetrated a fraud on them that resulted in actual harm, in the form of

economic loss, and that they suffered emotional distress attendant to that harm.[18]

## B.

### *Emotional Distress for Experiencing Credit Problems*

 In advancing their second argument, concerning loss of credit, the appellants rely on *Sterling v. Marine Bank of Crisfield,* 120 Md. 396, 87 A. 697 (1913). In that case, the sheriff levied on certain items of merchandise of a store owner—tobacco, candies, and soft drinks—that were wrongfully attached by a bank. The store owner sued the bank for economic damages. A jury trial resulted in a defense verdict.

On appeal, the store owner challenged several rulings and instructions by the trial court concerning the proper measure

---

18. In the course of their argument, based on *Vance,* that the buyers were required to introduce evidence of objective manifestations of their emotional distress, Irwin and Wood suggest that, because the jurors awarded the buyers identical recoveries for non-economic damages, the awards must have been punitive, not compensatory. The jurors were instructed about the compensatory nature of the damages sought, and we shall presume that they followed those instructions. *Carter v. State,* 366 Md. 574, 592, 785 A.2d 348 (2001). We see nothing in this record to suggest that the jurors awarded non-economic damages to punish Irwin and Wood (or any of the defendants) instead of to compensate the buyers for their emotional distress. The mere fact that each award was for the same amount of money does not mean that the awards were punitive, or were not supported by the evidence. While each buyer did not endure the exact same ordeal, the jurors reasonably could have found that they all suffered emotional distress as a direct result of the fraud practiced upon them and that $145,000 was a fair sum to compensate each one for his or her distress. *Southern Mgmt. Corp. v. Mariner,* 144 Md.App. 188, 197, 797 A.2d 110 (2002); *Butkiewicz v. State,* 127 Md.App. 412, 425, 732 A.2d 994 (1999); *Standiford v. Standiford,* 89 Md.App. 326, 343, 598 A.2d 495 (1991).

Hoffman also argues that, in addition to objective evidence of emotional distress, the buyers were required to introduce expert opinion testimony about their emotional states. As explained, the "physical injury rule" did not apply to the fraud claim in this case. Moreover, there is an obvious cause-and-effect between being the victim of a fraudulent scheme such as that practiced here and emotional distress, such that expert witness testimony on the topic was not required. *See Shpigel v. White,* 357 Md. 117, 131, 741 A.2d 1205 (1999). *See also Vance, supra.*

of damages. The Court of Appeals reversed, holding that two elements of economic damage that properly could be recovered in a wrongful attachment action were 1) the value of or damages to the goods actually seized; and 2) the actual, ascertainable loss of profit consequential to the interruption of the business. In response to an argument advanced by the store owner, the Court explained that in such an action recovery could not be had for "damage to the credit, if any, of the plaintiff" because it is "too uncertain and speculative a matter to be left to the jury." 120 Md. at 402, 87 A. 697.

Unlike the plaintiff in *Sterling*, the buyers in the case at bar were not seeking economic damages for loss of credit. (As we shall explain, *infra*, in Part IV, in closing argument, the buyers' lawyer itemized the economic damages being sought, which did not include damages for loss of credit; and, except for one discrepancy that is *de minimis*, the jury awarded the buyers economic damages in the amounts sought.) The issue of credit related to the buyers' claims for non-economic, emotional distress damages. There was evidence introduced showing that, after being deceived into purchasing deteriorating properties at inflated values, the buyers experienced credit problems, either by virtue of foreclosure actions against them or their inabilities to pay expenses incurred for repairs to the properties; and that the credit problems were a source of anxiety and embarrassment to them. The jurors properly were permitted by the trial court to take the buyers' negative credit experiences into account in considering their claims for emotional distress damages.

## IV.

### *Jury Instructions*

Irwin and Wood advance various challenges to the trial court's instructions, or lack thereof, at the close of the case and during closing argument.

Rule 2–520 governs jury instructions in civil cases. The court must instruct the jury at the close of the evidence, and may do so, *inter alia*, by granting requested instructions,

giving instructions of its own, or combining these methods. The court has discretion to give interim instructions. Rule 2–520(a) and (c).

■ A party is entitled to have his theory of the case presented to the jury by way of instructions but only if the theory is a correct exposition of the law and the theory is generated by the evidence in the case. *Sergeant Co. v. Pickett,* 285 Md. 186, 194, 401 A.2d 651 (1979); *Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258 (1974); *Boone v. Am. Mfrs. Ins. Co.,* 150 Md.App. 201, 225, 819 A.2d 1099 (2003). However, "[t]he court need not grant a requested instruction if the matter is fairly covered by the instructions actually given." Rule 2–520(c).

## A.

### *Refusal to Instruct on Defense of Equitable Estoppel*

■ Irwin and Wood contend that the trial court erred in declining to instruct the jury on the defense of equitable estoppel. They argue that one of their principal defenses related to the buyers' submission of false gift letters to support their loan applications, which appellants claim triggered the need for an equitable estoppel instruction. In support of their argument, Irwin and Wood cite *Impala Platinum, Ltd. v. Impala Sales (USA), Inc.,* 283 Md. 296, 389 A.2d 887 (1978), which addressed the doctrine of equitable estoppel, as follows:

Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Impala, supra,* 283 Md. at 322, 389 A.2d 887 (citations omitted).

In response, the buyers, citing *Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 489, 240 A.2d 245 (1968), argue that the doctrine was not applicable because a party raising the estoppel must himself be free from fraud in the transaction. The buyers assert that, because Irwin and Wood could not fulfill the "good faith" component necessary to invoke the doctrine, the trial court correctly denied their request for an instruction on the doctrine.

We agree with the buyers that an equitable estoppel instruction was not generated by the evidence. The buyers' claims against Irwin and Wood all were predicated on fraudulent conduct on their part. If the jury found, as it did, that Irwin and Wood were liable for fraud, then equitable estoppel could not be raised as a defense. If, on the other hand, the jury found in Irwin and Wood's favor on all three counts, the issue of equitable estoppel would be moot because they would not need an affirmative defense. Therefore, the trial court did not err in declining to instruct the jury on the affirmative defense of equitable estoppel.

## B.

### *Instruction on Economic Damages*

Irwin and Wood next contend the trial court erred in its instructions on economic damages for fraud both as to the standard of proof of damages and the type of damages recoverable.

### (i)

### *Standard of Proof of Damages for Fraud*

The trial court gave the jury written instructions and oral instructions. Its written instruction Number Four stated:

The burden of proving fraud and conspiracy to defraud by clear and convincing evidence applie[s] to the elements of the claim. Individual items of damage attributable to these claims must only be provided [sic] by a preponderance of the evidence.

The written instructions further directed the jurors that, with respect to Question Six on the verdict sheet, asking them to list the damages they were awarding, if any, for fraud, conspiracy to defraud, or both, the buyers were required to prove, by a preponderance of the evidence, "each item of injury or loss claimed to be sustained...." The trial court's oral instructions for the most part mirrored its written instructions.

Irwin and Wood objected to written instruction Number Four. They argued that the court's directive that "[i]ndividual items of damage attributable to [the fraud] claim[ ] must only be provided by a preponderance of the evidence" was legally incorrect, because proof of all the elements of fraud, including damages, must be by clear and convincing evidence.

Notwithstanding their objection to written instruction Number Four, Irwin and Wood made no objection to the written instruction about Question Six on the verdict sheet—which was in substance identical to written instruction Number Four. They also did not object to the trial court's oral instructions about the preponderance of the evidence standard for proof of items of damages sustained as a result of fraud.[19]

On appeal, Irwin and Wood argue, in a single paragraph of their brief, that the clear and convincing evidence standard of proof applies to all elements of the tort of fraud, and therefore the part of the court's instruction telling the jury that individual items of damage only had to be proven by a preponderance of the evidence was legally incorrect. The buyers respond that this argument confuses two distinct concepts: the fact of an injury proximately caused by the defendant's fraud, which they argue must be shown by clear and convincing evidence, and the value of that item of loss, which they argue may be shown by a preponderance of the evidence.

We conclude that Irwin and Wood waived this issue for appellate review. Rule 2–520(e) provides that "[n]o party

---

19. Hoffman did not object to any of these instructions.

may assign as error the giving or failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds for the objection." "[A] party must fully comply with the requirements of the rule at every stage of the instructions in order to preserve his rights." *Casey v. Roman Catholic Archbishop of Baltimore*, 217 Md. 595, 612, 143 A.2d 627 (1958) (addressing the predecessor rule).

In *Casey*, the Court held that a party's objection to an original instruction on damages, which prompted the court to give an amended instruction on damages, did not suffice to preserve for appellate review the issue of the legal correctness of the amended instruction, to which the party did not object. In a similar vein, in *Sydnor v. State*, 365 Md. 205, 776 A.2d 669 (2001), the defendant did not object to the trial court's self-defense instruction; [20] during deliberations, the jury asked a question about self-defense, to which the court responded by giving an amended instruction on the same topic, to which the defendant objected. On appeal, the Court held that the defendant's failure to object to the original instruction did not operate to waive his challenge to the amended instruction, because the amended instruction differed from the original instruction. It was implicit in the Court's holding in this regard that, had the instructions been the same, the defendant's failure to object to the instruction as first given would have precluded him from challenging on appeal the instruction as given a second time.

In the case at bar, Irwin and Wood objected to written instruction Number Four, on the standard of proof of damages, but did not object to the written instruction about Question Six on the verdict sheet, which covered the same topic. The two written instructions communicated the same

---

**20.** In criminal cases, under Rule 4–325(e), a party must object to the giving or failure to give an instruction to preserve the issue for appellate review.

concept to the jury: that, with respect to the fraud claim, proof of the value of an item of loss could be made by a preponderance of the evidence.[21] Especially given that the trial court's instructions were provided to the jury in writing, as well as orally, and therefore would be a tangible reference for the jurors during deliberations, it was not sufficient for Irwin and Wood to lodge an incomplete objection to the standard of proof instruction. Had the trial court changed written instruction Number Four, as Irwin and Wood suggested, the jury still would have been instructed, in the written instruction on Question Six, that, in deciding the issue of damages for fraud, it was sufficient for the buyers to prove each item of loss by a preponderance standard. Thus, to preserve the issue whether the trial court properly instructed the jury on this point, it was necessary for Irwin and Wood to object to both instructions.

### (ii)

### *Type of Damages Recoverable*

The court instructed the jury:

If you have found in favor of any Plaintiff or against any Defendant for conspiracy to commit fraud or fraud, . . . you must then consider the amount of damage which you find that that Plaintiff sustained. You must then consider the question of damages and it will be your duty to consider in what amount that will fairly and adequately compensate each Plaintiff. . . .

\* \* \* \*

You are not to engage in speculation. You are not to guess but your award must adequately and fairly compensate the Plaintiff for the injuries sustained.

---

**21.** We note that courts in other jurisdictions have expressly held that even when the elements of a fraud claim must be proven by clear and convincing evidence, or its equivalent, damages need only be proven by a preponderance of the evidence. *See Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp. 543, 548 (D.Conn.1996); *County of Oakland v. Vista Disposal, Inc.,* 900 F.Supp. 879, 890–91 (E.D.Mich.1995); *United Parcel Service v. Rickert,* 996 S.W.2d 464, 468–69 (Ky.1999).

\* \* \* \*

In determining economic injury you may consider all losses that the Plaintiff that you found for has sustained and you should endeavor to compensate that person so as to put him or her in a position as nearly as possible that they would have been in if the injury or loss had not occurred.

Irwin and Wood excepted to this instruction, arguing that, based on *Hall v. Lovell Regency Homes Ltd. P'ship,* 121 Md.App. 1, 12, 708 A.2d 344 (1998), because the allegations of fraud arose out of the sale of real property, the court should have instructed the jury as follows:

In fraudulent cases involving real estate transactions Maryland Courts have applied a flexible measure of damages that allows the Plaintiff to choose between two tests for damages. The preferred test is the out of pocket rule which [is] the difference between the amount of the purchase price the buyer has paid and the actual value of the property on the date it was sold. The other acceptable measure of damages is the benefit of the bargain [ ] test in which the damages are the [ ] difference between the actual value of the property at the time of making the contract and the value that it would have possessed had the representations been true. Under either test the goal is to put the buyer as nearly as practicable in the position he would have been in had he not been defrauded. If the Plaintiffs fail to present competent evidence under either of the two tests set out above, they are not entitled to recover damages as a matter of law.

\* \* \* \*

Under either the benefit of the bargain or the out of pocket test, the Plaintiff's evidence must establish the difference between two like valuation variables at one point in time. It is the difference between the two valuation figures at one point in time that quantifies the Plaintiff's lost benefit or her out of pocket loss. The Plaintiff that presents valuations figures at different points in time cannot recover damages as there is simply no basis for comparison of the valuation

figures as intervening forces may have impacted the value of the property during (inaudible) point in time.

The court denied the exception.

In closing argument, the buyers' lawyer discussed damages with the aid of a chart that set forth for each buyer the precise sum of economic damages being sought, and explained to the jurors what those sums represented. He asked the jury to award to each of the three buyers who still owned the properties they had purchased (Henderson, Elder, and Green) three items of damage: an "over valuation" amount (which he explained was the difference between the amount paid for the house on the date of purchase and the actual value of the house on that date); an "excess mortgage payments" amount (which he explained was the difference between the mortgage payments the buyer had paid up to the time of trial and the amount of the mortgage payments the buyer would have paid for the same time period if the house had been sold at its actual value, not at an inflated value); and compensation for the cost of making repairs that Beeman had promised he would make to the house but did not make.

As applied to the three buyers in question, the damages sought were:

Henderson: $ 35,000 over valuation
$ 12,477 excess mortgage payments
$ 2,446 repairs not performed by Beeman
$ 49,923

Elder: $ 21,000 over valuation
$ 8,064 excess mortgage payments
$ 29,264

Green: $ 14,000 over valuation
$ 1,263 excess mortgage payments
$ 850 repairs not performed by Beeman
$ 16,113

The buyers' lawyer asked for the jury to award these precise sums in economic damages, and the jury did so.

The other six buyers (Stamper, Brower, Spencer, Coward, McFadden, and Haley) had lost their properties by foreclosure

and, because their mortgages were FHA-insured, were not liable for any deficiency. The buyers' lawyer asked the jury to award each of these buyers reimbursements of any down payments made; any mortgage payments made; any moving and storing costs incurred; any property repair and maintenance costs incurred; and certain other consequential damages we shall specify below:

| Stamper: | $ 500 | down payment |
| | $1,403.82 | mortgage payments made |
| | $ 380 | moving and storage costs |
| | $1,916.85 | property repairs and maintenance |
| | $4,200.67 | |

| Brower: | $ 202.72 | mortgage payments made |
| | $ 325 | moving and storage costs |
| | $ 209.50 | property repairs and maintenance |
| | $2,843.48 | SELP loan still owned to Baltimore City |
| | $3,580.70 | |

| Spencer: | $ 209.50 | property repairs and maintenance |
| | $2,843.48 | SELP loan still owed to Baltimore City |
| | $3,052.98 | |

| Coward: | $6,777.19 | mortgage payments made |
| | $ 400 | moving and storage costs |
| | $ 1,850 | property repairs and maintenance |
| | $ 9,027 | |

| McFadden: | $ 500 | down payment |
| | $2,878.47 | property repairs and maintenance |
| | $ 500 | moving and storage costs |
| | $ 605 | additional property repairs and maintenance |
| | $ 6,000 | value of furniture put out on street during eviction and stolen |
| | $ 10,483 | |

| Haley: | $1,227.36 | mortgage payments made |
| | $ 950 | property repairs and maintenance |
| | $ 950 | value of furniture, clothes, and carpets ruined and replaced due to water damage |
| | $3,127.36 | |

In each case except for Stamper's, the buyers' lawyer asked the jury to award the sums listed above, and the jury gave an award in that amount. In Stamper's case, the jury was asked to award $4,245.67 (instead of $4,200.67), for reasons we

cannot discern from the record, and the jury gave the amount requested.

In his closing argument, counsel for Irwin and Wood did not address the items of damage sought in the chart the buyers' lawyer had presented to the jury. Irwin and Wood's lawyer argued that the jurors could not speculate about damages; that they should consider (and, though not expressly stated, but implied, offset) the benefits the buyers had derived, such as living in the houses for periods of time much longer than the months for which they made their mortgage payments, and further consider that in McFadden's case, he could have removed his belongings before the sheriff put them on the street; that the root of the buyers' problems was the poor conditions of the properties, not the loans extended to them, so the damage award should focus on Beeman, not on Irwin and Wood; and that they were to keep in mind that they could not use a damages award to punish Irwin and Wood.

Irwin and Wood argue that the trial court erred by not giving the instruction they requested based on the *Hall* case, and by instead giving an instruction that did not give the jurors proper guidance about the measure of economic damages in fraud and conspiracy to defraud cases involving real estate transactions. They assert that the jury should have been told that the buyers could recover either the difference between the sum paid on the date of purchase and the actual value of the property on that date, under the "out of pocket" test; or the difference between the actual value of the property and the value the property would have had if the representations been true, at some point in time after the sale, under the "benefit of the bargain" test; and that, had they been so informed, they would have known that none of the other damages claimed were recoverable.

Thus, according to Wood and Irwin, the jurors should have been given enough information to know first, that the three buyers who still owned their properties only should have been entitled to recover the over valuation sums they sought, and not the additional sums for excess mortgage payments and

repairs promised by Beeman but not made; second, to know that the other six buyers were not entitled to recover anything, because there were no over valuation damages for them (their houses having been foreclosed on and no longer being owned by them); and third, that no other type of damage was recoverable.

The buyers respond that the instruction as given was an accurate statement of the law and that, under the flexibility theory of fraud damages discussed by the Court of Appeals in *Hinkle v. Rockville Motor Co.,* 262 Md. 502, 511–12, 278 A.2d 42 (1971), they were entitled to recover the damages they were awarded.

The trial court properly declined to give the instruction requested by Irwin and Wood. The instruction only was partially applicable to this case and would have been misleading to the jury. We explain.

In the *Hall* case, purchasers of a number of new houses in a Frederick County development brought tort and contract claims, including a claim for fraud, against the home builder. *Hall, supra,* 121 Md.App. at 5, 708 A.2d 344. The crux of the homeowners' allegations was that their houses, which they still owned and lived in, were constructed and the streets in the development were designed such that water leaked into their basements; that they had been told by the builder prior to construction that the houses would not have water problems and the basements would be able to be finished off; and that the water problems the houses were experiencing were irreparable and made the houses uninhabitable. *Id.* at 6–7, 708 A.2d 344.

At trial, the homeowners introduced expert testimony that, due to the water leakage problems, the present fair market value of each house was zero. They did not introduce competent, non-speculative evidence of the present fair market value of the houses without the alleged defects. In addition, although they introduced evidence of the prices they paid for the houses on their purchase dates, *i.e.,* the values of the houses in the conditions as represented by the builder on the

date of the purchases, they did not introduce evidence of the values of the houses with the defects on their purchase dates.

On that basis, the trial court ruled that because the homeowners did not present evidence of the values of their houses with and without the alleged defects at a single point in time, they had not presented sufficient evidence to recover out of pocket damages for loss in value or benefit of the bargain damages for loss in value. *Id.* The trial court instructed the jury that they could not award damages for loss of value of the houses, but they could award damages for any actual costs of repair; and if they found the homeowners did not prove any actual repair costs, they were to award nominal damages. *Id.* at 10, 708 A.2d 344. The jury found in favor of the homeowners on several claims, including fraud, but awarded them nominal damages. *Id.* at 10–11, 708 A.2d 344.

On appeal by the homeowners, we affirmed the judgment, holding that the trial court properly had ruled that, without evidence of loss in value at a single point of time—either at the time of sale, under the out of pocket theory of recovery, or at a later time, under the benefit of the bargain theory of recovery—the homeowners did not present sufficient evidence to permit the jury to award loss of value damages. *Id.* at 22–23, 708 A.2d 344.

▆▆▆▆ In the case at bar, the three buyers who still owned their properties presented evidence of the "as represented" values of their properties on the dates of sale and the actual values of their properties on the dates of sale. Thus, they introduced sufficient evidence to establish, under the out of pocket theory of recovery, the loss of value in their properties as calculated at a single point in time. Moreover, that is the sum they sought for damages for "over valuation," and that they were awarded; and, as noted, Irwin and Wood concede these buyers were entitled to recover that sum. What Irwin and Wood were seeking to do by requesting the instruction based on *Hall*, however, was to limit these buyers to that recovery only. Yet, *Hall* does not stand for the proposition that loss of value is the only item of damages

recoverable in a fraud action involving the sale of real property, and that the plaintiff cannot also recover other items of consequential damages.[22] The instruction sought would have misled the jury to think otherwise.

 *Hall* also does not stand for the proposition that a plaintiff property buyer suing for fraud in the sale of real property who no longer owns the property and is not seeking damages for loss in value is not entitled to any other damages proximately caused by the fraud. For that reason, the re-

---

**22.** Irwin and Wood's argument as to why the three buyers who remained in their homes were not entitled to recover the excess mortgage payments and repair costs is that "[t]he out-of-pocket test does not provide for recovery of these items." As mentioned in the text above, however, we do not think that the out-of-pocket test limited the buyers' recovery to only the amount of overvaluation. They also were entitled to other consequential damages resulting from the fraud.

That being said, we are cognizant that, when consequential damages are awarded, they should not represent amounts that are accounted for in the overvaluation award. In the present case, Irwin and Wood did not challenge the economic damages award on the basis that recovery for excess mortgage payments and repair costs were duplicative of the overvaluation award. Instead, they challenged the adequacy of the jury instructions and the propriety of allowing the jury to award costs other than for overvaluation. Therefore, we consider only that specific issue to have been raised.

We will briefly comment on the propriety of the jury's awarding damages for the excess mortgage payments, however. First, we see the jury's award of those amounts as a means for the buyers to recoup the excess interest payments that they made on the inflated loans for the time period from the date of the sale to the date of the judgment. Such an award is consistent with the fact that for the first several years of a mortgage loan the monthly sum that the borrower is paying is close to 100% interest. Thus, there was no duplication of recovery for the overvaluation except for the tiny portion of the excess payments that actually went to principal, which we find would be *de minimis*.

On the repair costs issue, it is unclear from the transcript whether the repairs made by the buyers were for items that Beeman promised to repair before settlement or repairs that he promised to make post-settlement. This distinction is important because if they were repairs he promised to make beforehand, then they would be included in the overvaluation amount. If they were post-settlement promises to repair, we would treat them as new promises that were separate from the original affirmation of value. Because we cannot tell from the transcript into which category they fit, and because the appellants did not raise this specific issue on appeal, we will not disturb the verdict on that basis.

quested instruction based on *Hall* was inapplicable to the six buyers whose properties had been foreclosed upon. The instruction would have incorrectly led the jurors to think they were not permitted to award damages to any of those buyers.

## C.

### *Refusal to Give a Curative Instruction During Closing Argument*

Finally, Irwin and Wood contend the trial court erred in declining to give a curative instruction after the initial closing argument by counsel for the buyers. They argue that certain comments by counsel in his initial closing "were an attempt to have the jury award punitive damages in the guise of non-economic damages," despite the court's ruling that the jury would not be permitted to assess punitive damages against them. In support, Irwin and Wood quote the following excerpts from the buyers' lawyer's closing argument:

> This kind of case makes a statement about what's acceptable in the entire community and it goes out from beyond here in sets of standards.
>
> \* \* \* \* \* \*
>
> [T]his is a case about making a difference, that in deciding on an award under this factor of what you believe is acceptable and unacceptable conduct towards other people is an important message to send out there and let them know, you can't treat people this way. You can't take people and run them through a process and take advantage of them, to use them just as means of production just to earn a profit.
>
> \* \* \* \* \* \*
>
> That's what you should consider when making your award here, of just what is the affect [sic] on people being used in this way. What it means for people to come in here and take advantage of others in this manner. Your award will say a lot about that. Often times people complain nothing

ever changes. This is a case where you have a chance to make a difference, a chance for things to change.

The buyers respond that Irwin and Wood did not object to the statements or seek a curative instruction on the ground they now advance. On the merits, they argue that the trial judge was in the best position to determine whether there was any impropriety in the remarks in the context of the entire argument and the evidence, and whether any prejudice occurred. They maintain that, ultimately, the decision to give a curative instruction rests within the sound discretion of the trial court, and the court here did not abuse its discretion. *See Vergie M. Lapelosa, Inc. v. Cruze,* 44 Md.App. 202, 215–16, 407 A.2d 786 (1979).

The record reflects that, after the initial closing argument, Irwin and Wood's lawyer said he had "two short objections on damages." He argued that counsel had invited the jury to award damages "as a basis of harm to Baltimore which [they] can't possibly be responsible for" and further said, "I think the jury should hear that that should not be a proper consideration. . . ." The court responded, "I'm not prepared to give that." Irwin and Wood's lawyer then complained that, by suggesting that the jurors award each buyer $200,000 in non-economic damages, without giving an "objective basis" for that amount, the buyers' lawyer was "in effect" asking the jurors to award punitive damages against Irwin and Wood.[23] Counsel did not seek a curative instruction on this topic, or any other relief. The trial court overruled the objection, observing that an award of non-economic damages in the case "could be substantial" but "I don't think [counsel for the buyers] was arguing punitives. He got very close . . . but I don't think he overstepped the bounds. . . ."

While the argument advanced on appeal is not identical to the request for curative instruction made below, the

---

**23.** The buyers' lawyer suggested that each buyer be awarded $200,000 in non-economic damages but further argued that the jurors could award more or less than that figure, and different figures for each buyer.

overlap is sufficient to preserve the issue for review. In essence, Irwin and Wood asked for a curative instruction to correct what they argued was an improper impression, conveyed to the jurors in the remarks quoted above, that compensatory damages could be awarded against Irwin and Wood not based on harm to the buyers but to make a statement to the community that "flipping" schemes are not to be tolerated.

The Court of Appeals has addressed the proper bounds of closing argument for the most part in criminal cases, in the context of whether a prosecutor's remarks have negatively affected the defendant's right to a fair trial. In that context, the Court has observed that counsel are afforded a wide range of latitude in closing argument, " 'to make any comment or argument that is warranted by the evidence proved or inferences therefrom.' " *Hill v. State*, 355 Md. 206, 222, 734 A.2d 199 (1999) (quoting *Wilhelm v. State*, 272 Md. 404, 412, 326 A.2d 707 (1974)). Counsel may assess the conduct of the parties, attack the credibility of witnesses, and in that regard "indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions." *Degren v. State*, 352 Md. 400, 430, 722 A.2d 887 (1999) (quoting *Wilhelm, supra,* 272 Md. at 413, 326 A.2d 707). Although there are "no hard-and-fast limitations within which the argument of earnest counsel must be confined," *id.,* counsel must not comment on facts not in evidence or make " 'appeals to class prejudice or to passion . . . [that] may so poison the minds of jurors that an accused may be deprived of a fair trial.' " *Hill, supra,* 355 Md. at 222–23, 734 A.2d 199 (quoting *Wilhelm, supra,* 272 Md. at 414, 326 A.2d 707); *White v. State*, 125 Md.App. 684, 705, 726 A.2d 858 (1999).

The propriety *vel non* of the closing remarks Irwin and Wood complain about only can be assessed by taking them in context. The buyers' lawyer gave an initial closing argument that lasted 1½ hours. It consisted among other things of a detailed review of the facts in evidence concerning each defendant and each buyer, including recapitulations of testimony; a discussion of the facts in light of the legal principles explained by the court in instructions; an accounting as to each buyer of

the economic injury suffered and the amount of damages sought; and an argument seeking compensation for each buyer for the emotional distress he or she experienced.

■■■ The first statement Irwin and Wood complain about, made toward the beginning of the initial opening, was part of an introductory discussion in which counsel was distinguishing the case, in terms of importance, from those about "who has the red light" and "how many physical therapy visits are justified." The remark, taken in context, was not an appeal to the jurors to award damages for harm to the community, or on any basis other than the evidence, or to award punitive damages against defendants other than the Beemans and AHOYO.

■■■ The second and third statements Irwin and Wood complain about were made much later in the initial closing, when counsel was discussing the buyers' claims for non-economic emotional distress damages. The comments in question were attacks on the conduct of the defendants made in the context of explaining how that conduct had caused anguish and humiliation to the buyers: that they had been taken advantage of, used as pawns in a process devised to generate financial gain, and treated in unacceptable and undignified ways.

The trial judge was in the best position to assess the import of these remarks, in their full context, and determine whether they were a proper observation about the nature of the defendants' conduct and request that the jurors award the buyers damages, in accordance with the law, to compensate them for their distress; or whether they were an improper plea for an award of punitive damages against Irwin and Hoffman. The trial judge made a considered ruling, taking into account that the sum being sought for compensatory emotional distress damages was not out of line with the substantial value of the buyers' emotional distress claims, and concluded that the remarks were not an improper attempt to recover punitive damages. We see no basis to disturb the trial judge's exercise of discretion.

### Cross–Appeal Issues

## V.

### *GRANT OF MOTION FOR JUDGMENT ON PUNITIVE DAMAGES AGAINST IRWIN, WOOD, AND HOFFMAN*

The buyers' first cross-appeal issue challenges the trial court's ruling granting Irwin, Wood, and Hoffman's motions for judgment on the issue of punitive damages. They contend the evidence adduced at trial made the question whether punitive damages were warranted against these defendants a jury question. Irwin, Wood, and Hoffman respond that neither the evidence of their own conduct nor the evidence of conduct by Beeman, imputed to them by virtue of their status as co-conspirators, could support a reasonable finding that punitive damages were warranted.

Punitive damages only may be awarded when a defendant commits a tort with "actual malice." *Darcars Motors of Silver Spring, Inc. v. Borzym,* 379 Md. 249, 841 A.2d 828 (2004). "Actual malice" is " 'conduct of the defendant characterized by evil motive, intent to injure, ill will or fraud.' " *Id.* at 264, 841 A.2d 828 (quoting *Owens–Illinois v. Zenobia, supra,* 325 Md. at 460, 601 A.2d 633). The defendant must have acted "with a consciousness of the wrongfulness of his [misconduct]," *Darcars, supra,* at 266, 841 A.2d 828, *i.e.,* with knowing and deliberate wrongdoing.

In *Ellerin v. Fairfax Savings, F.S.B., supra,* 337 Md. 216, 652 A.2d 1117, the Court of Appeals explained that, given the state of mind that must be proven to support a finding of "actual malice," not all instances of fraud will support an award of punitive damages, because not all instances of fraud involve "actual malice." Fraud committed with "actual knowledge of falsity, coupled with [an] intent to deceive" is fraud committed with consciousness of wrongdoing, and will support a finding of "actual malice" warranting punitive damages. By contrast, fraud committed with "reckless disregard" for the truth does not meet the state of mind of consciousness of wrongdoing (even though there is an intent to deceive), and

hence does not involve "actual malice," and will not warrant the imposition of punitive damages. As the Court explained:

[T]he elements of the tort of fraud or deceit in Maryland where the tort is committed by a defendant who knows that his representation is false, include the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages.

*Id.* at 235, 652 A.2d 1117.

The buyers maintain that the evidence at trial was sufficient to support a finding, by a clear and convincing standard, that Wood acted with conscious knowledge of the falsity of the impressions she was giving the buyers, not merely with reckless disregard for the truth or falsity of those impressions, and therefore with "actual malice"; and thus it was a jury question whether punitive damages were warranted against her and hence against Irwin. *See Embrey v. Holly*, 293 Md. 128, 137, 442 A.2d 966 (1982) (holding that punitive damages may be imposed against employer for tortious conduct of employee). Likewise, they maintain that the evidence adduced reasonably could support a finding, by the same standard, that Hoffman communicated false information about the values and conditions of the properties deliberately and with knowledge that he was communicating false information, not simply with reckless disregard for whether the information was true or false. Thus, the jury should have been permitted to decide whether his fraudulent conduct was taken with "actual malice," and warranted the imposition of punitive damages.

Harkening back to an earlier argument, Irwin and Wood respond that the evidence was insufficient to support a finding that Wood made any false misrepresentation, and "the most the jury could have found is that Wood *should have* known that Beeman was committing fraud and that [the buyers] were submitting false gift letters." Hoffman responds that the evidence at most established that he engaged in fraud of the "reckless disregard" type.

For the same reasons we have explained in Part II, as to why the evidence was sufficient to support the jury's finding of

liability for fraud against Irwin, Wood, and Hoffman, the evidence was sufficient to send the issue of punitive damages to the jury as to all of these defendants.

An interpretation of the facts and legitimate inferences most favorable to the buyers could have supported, by a clear and convincing standard, reasonable findings that, in the course of her meetings with the buyers, Wood deliberately engaged in a scheme to create false impressions about Beeman's role in the sales transactions, the values of the properties being purchased, and the legitimacy of the means being employed to effectual the sales, including the use of gift letters in violation of FHA regulations; that her conduct enabled Beeman to accomplish the closings, and turn hefty profits illegally; that she acted with actual knowledge of Beeman's wrongful acts; and, of significance to this issue, that her actions were taken with conscious knowledge that she was creating false impressions for the buyers by which they were being deceived into purchasing the properties in question at prices that were inflated. The evidence thus was sufficient to allow a finding that punitive damages were warranted against Wood (and hence Irwin), and the issue should have been submitted to the jury.

So, too, the evidence most favorable to the buyers could have supported reasonable findings that Hoffman furnished false information about the conditions of the properties and assigned inaccurate, inflated appraisal values to them with conscious knowledge of his wrongdoing, not merely with reckless indifference to the truth or falsity of the information. To be sure, there was evidence that Hoffman's appraisal practices were sloppy, and he tried to portray himself to the jury as merely careless, at most, to the point of recklessness. The evidence about his interactions with Beeman to justify the final appraisal numbers, his omission from the reports of facts that would reveal that the recent sales of the properties themselves and other nearby properties did not support the values he was assigning, and the evidence that he omitted information that would reveal property defects, if credited by the jury, however, could support a reasonable finding that

Hoffman knew he was furnishing false information. The question whether punitive damages were warranted against Hoffman was a jury issue on the evidence adduced.[24]

The evidence adduced at trial supported the jury's verdicts against Irwin, Wood, and Hoffman for fraud and its award of compensatory damages on the fraud verdicts. The evidence could have supported a decision by the jury that Irwin and Wood, Hoffman, or all three committed fraud with "actual malice," warranting punitive damages. Had the jury decided that that was the case, a separate punitive damages hearing would have been held and the jury would have rendered an award of punitive damages in some amount.

Because the punitive damages issue was incorrectly withheld from the jury for decision, the buyers are entitled to a partial new trial on the issue of whether punitive damages are warranted against the appellants. The evidence presented at the retrial must itself be legally sufficient to prove the buyers' entitlement to punitive damages. *Middle States Holding Co., Inc. v. Thomas*, 340 Md. 699, 703–04, 668 A.2d 5 (1995); *Owens–Illinois v. Zenobia, supra*, 325 Md. at 472, 601 A.2d 633; *Owens–Illinois v. Armstrong*, 326 Md. 107, 128–29, 604 A.2d 47, *cert. denied*, 506 U.S. 871, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992). If it is, and if the jury answers the issue affirmatively, a separate hearing on the proper amount of punitive damages shall be held and the jury's final punitive damages award shall be made based on the evidence presented at that hearing.

## VI.

### CALCULATION OF ATTORNEYS' FEES UNDER CPA

On February 7, 2002, after judgment was entered, the buyers' lawyers filed a petition for attorneys' fees under the

---

**24.** The buyers raise an alternative argument, to which the appellants respond, that, if the evidence were found insufficient to have supported findings of "actual malice" based on the conduct of Wood and Hoffman, the evidence still could support a finding of "actual malice" by them based solely on their status as co-conspirators with Beeman. Given our holding, it is not necessary to address this issue.

MCPA. The appellants opposed the petition. A hearing on the petition was held on March 21 and April 2, 2002.

On May 13, 2002, the trial court issued a memorandum opinion explaining that it was going to award the buyers' lawyers $195,591.26 in fees and expenses. The court noted the award was reasonable and appropriate, given the time expended, the competency of counsel, and the risk involved in undertaking and prosecuting the case. The court stated, however, that the award was subject to a credit for any sums the buyers' lawyers might receive in the future under their contingency fee agreements with each buyer. Specifically, the court stated:

> If the case is settled or judgment is rendered on the conspiracy or fraud or punitive damages claims, and the [buyers' lawyers] secure[ ] by settlement or judgment any amount under the contingent fee agreement, any such payment shall reduce the amount to which [the buyers' lawyers] are entitled to receive for attorneys' fees awarded by this Court under the Consumer Protection Act.

The court's decision was incorporated into an order issued the same day and entered on the docket on May 14, 2002. On cross-appeal, the buyers assert that the trial court erred in conditioning the amount of the judgment for fees on sums otherwise collected as attorneys' fees.

Because we are remanding the case for a new trial on the issue of punitive damages, we shall vacate the award of attorneys' fees.

Section 13–408(b) of the Commercial Law Article ("CL"), Md.Code (2002 Repl.Vol., 2002 Supp.), confers discretion on the court to award reasonable attorneys' fees to any person who is awarded damages in a claim brought under the MCPA. The court's decision whether to award attorneys' fees and, if so, the amount of the award, is to be made upon a consideration of the total circumstances of the case. *See The Milton Co. v. Council of Unit Owners of Bentley Place Condominium,* 121 Md.App. 100, 121–22, 708 A.2d 1047 (1998). Those circumstances include the amount of money in contro-

versy in the case and the results obtained. *Blaylock v. Johns Hopkins Federal Credit Union*, 152 Md.App. 338, 361, 831 A.2d 1120 (2003).

Our decision to remand this case on the issue of punitive damages creates the possibility that the buyers, or some of them, will be awarded punitive damages against one or more of the appellants. Such a result would alter the total circumstances that were before the court when it awarded attorneys' fees to the buyers' counsel. Therefore, the decision whether to award attorneys' fees against the appellants and, if so, the amount of the award, should be reconsidered by the court after the issue of punitive damages has been resolved.

For guidance on remand, however, we make the following observation. The trial court was concerned, in making its award, that the buyers' lawyers might enjoy a double payment for their work on this case if they were to collect on a judgment for attorneys' fees and also collect their contingency fee from their clients. The contingent fee agreement, which was submitted to the court, states, however, that the fee will "not exceed one-third of any compensatory damages and any punitive damages," and that "[t]he combination of court awarded fees and the [one-third] percentage fee shall not exceed the [one-third] percentage fee alone." Thus, as the buyers point out, collection on a judgment entered as an award of attorneys' fees would not result in additional compensation to the buyers' lawyers for their work on this case, under the terms of the contingency fee agreement.

**JUDGMENT ON ISSUE OF PUNITIVE DAMAGES AGAINST IRWIN, WOOD, AND HOFFMAN REVERSED AND REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; JUDGMENT FOR ATTORNEYS' FEES AGAINST IRWIN, WOOD, AND HOFFMAN VACATED, AND ISSUE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH**

346

THIS OPINION; JUDGMENTS OTHERWISE AF-
FIRMED. COSTS TO BE PAID BY THE APPELLANTS.